145 N.J. Super. 301 (1976)
367 A.2d 904
LUIS M. MARTINEZ, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, A MASSACHUSETTS INSURANCE CORPORATION, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 1, 1976.
Decided December 6, 1976.
*304 Before Judges BISCHOFF, MORGAN and COLLESTER.
Mr. John L. McGoldrick argued the cause for appellant (Messrs. McCarter & English, attorneys; Messrs. John L. McGoldrick and George T. Hill on the brief).
*305 Mr. Joseph A. Dambach argued the cause for respondent (Mr. G. Richard Malgran on the brief).
The opinion of the court was delivered by MORGAN, J.A.D.
At issue in this appeal is the sum of $100,000 representing accidental death benefits (hereinafter ADB)[1] under a policy of life insurance admittedly not affording coverage therefor and for which no premium had ever been paid. The trial judge sitting as the trier of the facts, awarded plaintiff the claimed ADB with simple interest at 6% calculated from July 15, 1971. Defendant John Hancock Mutual Life Insurance Company, appeals and plaintiff cross-appeals with respect to those issues concerning the rate and type of interest and denial of his application for counsel fees.
Many of the essential facts are undisputed. In 1968 plaintiff Luis M. Martinez, a native Cuban and United States resident since 1965, and Joseph Gallagher formed a partnership in a small fence company. Martinez ran the company's Edison office; Gallgaher operated out of the partnership's Pennsauken office.
Early in the history of the partnership a buy-sell agreement was entered into whereby at the death of one of them the surviving partner would purchase the deceased partner's share for $45,000. The agreement was funded by life insurance policies on the partners' lives, each partner being the beneficiary of the policy on the other's life. The $45,000 policies were issued by defendant and neither contained ADB. They had been purchased through one of defendant's agents, who had subsequently left its employ.
In the spring of 1970 Joseph Gallagher, realizing that the existing buy-sell agreement no longer reflected the increased value of the business, and that the $45,000 policies were *306 similarly inadequate, suggested to plaintiff that new agreements be executed increasing the purchase price of their shares and additional coverage be procured to fund this new agreement. Plaintiff agreed and left it to Gallagher to arrange for the insurance.
Accordingly, Gallagher consulted Muller, the agent who obtained the prior policies, erroneously assuming that he still represented defendant insurance company. Muller, failing to dispel this incorrect assumption, submitted to his new employer, Intercontinental Life Insurance Company, applications for life insurance which did not request ADB. While these applications were being processed Gallagher, through Thomas F. Mullen, became aware that the applications were being made to a company other than defendant. Mullen did represent defendant, and when Gallagher realized this, and desiring to do business only with defendant, he apparently withdrew his application to Intercontinental, and a meeting was arranged with Mullen and plaintiff for the execution by the partners of applications to defendant for the new life insurance policies.
The meeting at Gallagher's home was held on July 7, 1970. It was Mullen who suggested that the applications include a request for ADB; both partners agreed and the applications were drawn, each requesting $100,000 term life insurance, ADB and a waiver of premium upon disability. A check for the first premium, in the amount of $102.97, was delivered to Mullen the following day.
Upon receipt of the applications at defendant's home office in Boston, the underwriting department rejected the request for ADB in accordance with their policy of refusing ADB in connection with policies procured to fund buy-sell agreements, the value of the business not being dependent upon the manner of the owner's death. Policies without ADB were issued, at a lower premium, with their corresponding applications attached thereto. Also attached, in duplicate, were defendant's Forms 174R, "Amendment to Application," for the *307 purpose of obtaining the insureds' signed acknowledgment of the denial of the requested ADB. The original copy of the "Amendment to Application" was to remain attached to the policy; the copy was to be returned to Boston.
In due course Mullen received the policies, without ADB, and with Forms 174R attached. He testified that on the outside of each policy appeared a slip of paper advising him, as agent, that the policies were not as applied for and that Forms 174R were attached for execution by the owners to acknowledge that fact, by amending their applications to eliminate the request for ADB.
Mullen testified that he arranged to meet with the partners at Gallagher's home to deliver the policies. Plaintiff failed to attend that meeting. According to Mullen, he explained to Gallagher that the policies did not afford ADB coverage and that the attached Forms 174R were to be signed by him and plaintiff in acknowledgment of that fact. Gallagher told Mullen to return the next day when he would have plaintiff's signature on the 174R form. Mullen returned, received from Gallagher the two forms, one purportedly bearing plaintiff's signature, the other Gallagher's, and both were forwarded to defendant's home office where they were filed. It was stipulated at the trial that both signatures were forged.
Shortly after issuance of the policies the partnership received a refund from defendant in the amount of $11.78, representing that part of the premium attributable to the rejected ADB coverage. The checks, however, did not specify their attribution, but merely stated that they were for "over-payment in premium." Routinely thereafter premiums in the reduced amount were automatically deducted from the partnership checking account.
In March 1972 Gallagher died from stab wounds inflicted during an altercation; his manner of death would have constituted a valid claim for ADB had coverage therefor been supplied. Defendant, however, paid the face amount of the policy covering Gallagher's life, $100,000, and rejected the *308 claim for double indemnity for the accidental manner of his demise. The present action ensued. Following a nonjury trial the trial judge, in an oral opinion, found as a fact that Mullen had forged both names to the 174R form and failed to inform Gallagher, and hence Martinez, of defendant's rejection of ADB coverage. He found that Martinez had never read the policy in his possession but concluded that his failure to read, in the given circumstances, was excusable and no bar to recovery. According to the trial judge, plaintiff was entitled to assume, without express notice from defendant or its agent to the contrary, that all coverage applied for had been granted. Since defendant failed to provide notification of the rejection of ADB coverage, plaintiff was entitled to its benefit, with the premiums for it being deducted from his recovery. Defendant appeals.
Defendant's challenge to the trial judge's finding that Mullen forged the signatures of Gallagher and Martinez to the Amendment to Application form and failed to inform either of them that the requested ADB had been rejected as being evidentially unsupported is without merit. Although direct evidence of such conduct was lacking, sufficient and substantial circumstantial evidence provided the needed support. Since both signatures were forged, it was reasonable for the trial judge to conclude that neither Martinez nor Gallagher was the party responsible; neither would have forged his own signature. Moreover, neither the insureds nor their spouses had an apparent motive for such conduct. The only person with any motive to forge and to conceal the rejection of ADB was Mullen; he might have feared loss of a substantial commission on $200,000 worth of life insurance by advising the insureds of the rejection of ADB coverage. The availability of proof on this issue was necessarily limited because only Mullen and Gallagher had direct knowledge of what occurred at the crucial meeting when the policies were delivered, and Gallagher was dead. If Mullen was, in fact, the forger and did attempt to conceal rejection of the request for ADB, then he had an additional *309 motive to be less than candid in his trial testimony  concealment of fraud; and the trial judge apparently took the view that his testimony was lacking in some measure of credibility. Hence, although the evidence concerning this issue was not strong, there is enough in the record, by way of circumstantial proof, to support the finding.
It by no means follows, however, that defendant is liable in excess of the coverage provided by the policy because of its agent's conduct. The critical issue concerning plaintiff's right to recover on coverage never written or paid for depends primarily, in this case, upon a determination as to whether plaintiff was under a duty to read the policy itself upon its delivery to him and the extent to which he is bound by what the policy would have disclosed to an average reader.
The policy in question is a relatively brief and uncomplicated one, unencumbered by the usual fine print and multiple hanging endorsements. It consists of but eight pages of printed matter on letter-size paper, on only one page of which typewritten matter personalizing the otherwise generalized and printed form appears. The typewritten information appears on a page entitled, in boldface type, "POLICY SPECIFICATIONS." The reader is referred to this page from the first page of the policy in which he is invited to read "policy specifications on page 3." The average lay reader would learn from the "POLICY SPECIFICATIONS" page that the life being insured was that of Joseph Gallagher, age 31, and that the face amount of the policy was $100,000. The "Policy Plan" was a "MODIFIED 10 YEAR TERM" scheduled to expire on August 18, 1980, with August 18, 1970 being the date of issue. The premium for the first three years was $45 and "thereafter for 7 years," $52. Finally, the policy indicated the company's "WAIVER OF PREMIUMS ONLY" on disability, for which benefit $2 was being charged. That is the total of the information on the "POLICY SPECIFICATIONS" page. The existence of ADB coverage is conspicuous by its absence of mention. *310 Nowhere is it indicated thereon that double the face amount of the policy will be paid in the event of accidental death.
The trial judge found, as a fact, that plaintiff had not read the policy, even though it had been in his possession for about 18 months after its issuance and prior to Gallagher's death. Nonetheless, it concluded that he was not barred from recovery because he was entitled to assume "that the insurance contract he receives is the same as that for which he applied." By this holding, essential to the ultimate determination, the trial judge seems to be excusing the insured from any and all examination of a requested policy since coverage is not ordinarily afforded unless requested. If that is indeed the import of the basis for decision, it is inconsistent with present law.
As early as 1926 the general rule in New Jersey has been that an insured is under a duty to examine his insurance policies; if the terms disclosed by such an examination are inconsistent with his desires, he is required to notify the company of the inconsistency and of his refusal to accept the policy in the proffered condition. Citizens Cas. Co. v. Zambrano Trucking Co., 140 N.J. Eq. 378, 380 (Ch. 1947), aff'd 141 N.J. Eq. 310 (E. & A. 1948); Crescent Ring Co. v. Travelers Indem. Co., 102 N.J.L. 85, 92 (E. & A. 1926). The exceptions subsequently carved out from this rule of general application are not pertinent to this case. The policy in question is not a renewal policy, as in Bauman v. Royal Indem. Co., 36 N.J. 12, 25 (1961), which an insured is permitted to assume affords coverage no less restrictive than that given in the policy being replaced. In this case the earlier and smaller policy did not provide coverage for accidental death benefits, the later policy was no more restrictive than the earlier one, and hence Bauman has no application to the present case. The policy in this case is not the lengthy, impossibly complex and affirmatively misleading policy that provided the basis of the opinion in Gerhardt v. Continental Ins. Cos., 48 N.J. 291, 299 (1966). *311 Plaintiff was in possession of the policy for 18 months before the loss and hence the exception relating to cases in which the insured, for some reason, has been unable to see the policy has no application. Volker v. Conn. Fire Ins. Co., 22 N.J. Super. 314, 323 (App. Div. 1952). Finally, there was no affirmative representation by the company or even its agent, Mullen, that ADB coverage was afforded by the policy; at best, the coverage was requested in the application; no one ever told plaintiff, or even Gallagher, that the request had been granted and hence the exception in Harr v. Allstate Ins. Co., 54 N.J. 287, 309-310 (1969), a case relied on by plaintiff and the trial judge, has no application.
The policy here was quite simple in its description of what coverage was being given for the stated premium. In our view, the average reader was enabled to understand the description, and had ADB coverage been expected, he would have been able to determine that such coverage was not being afforded by the policy in question. At the very least, a question concerning the existence of such coverage would have been raised in the mind of the average reader; an inquiry to the company or its agent would either have resolved the question or generated a representation as to the extent of coverage. Nothing of the sort happened in this case because, as the trial judge found, plaintiff never even read the policy.
Here, it should be stressed that Mullen's fraud had no effect in inducing plaintiff to do, or refrain from doing, anything; plaintiff was at all times unaware of the forgery, and of the instrument to which his name was forged, until after claim for ADB had been made. The vice in the forgery and in Mullen's failure to advise Gallagher that ADB coverage had been rejected was in its frustration of defendant's good faith attempt to provide notification of the rejection of ADB coverage additional to the information contained in the policy contract itself. Under the trial judge's holding that an insured is entitled to assume, in the absence of express notification to the contrary, that coverage requested has been *312 granted, a statement in the policy itself that a requested area of coverage has been rejected would be of no avail since the insured is not bound to examine the policy. This is not the current state of the law which binds us as well as the trial judge; if there is to be a change in the law, it must originate elsewhere.
Consideration of the extent of an insured's duty to read an insurance policy is germane to the two theories upon which an insurer's liability can be expanded beyond that undertaken in the policy itself: reformation of the policy and equitable estoppel of the insurer to deny noncoverage.[2] Neither theory finds support in this case. The extraordinary remedy of reformation is available only "where there is mutual mistake [not here present] or where a mistake on the part of one party is accompanied by fraud or other unconscionable conduct of the other party." Heake v. Atlantic Cas. Ins. Co., 15 N.J. 475, 481 (1954). Clear, convincing proof of facts pertinent to the remedy is required. Id. at 485. In Heake the applicant for automobile liability insurance, a newly licensed 17-year-old driver, truthfully disclosed to the carrier's agent his age and his minimal driving experience. The agent, however, misrepresented both facts to his principal, and the policy which thereafter issued excluded coverage for newly licensed drivers under 25 years of age, a fact discovered only after the loss. In Heake the young driver had merely read the declarations page of the policy and finding the information there to be accurate, put *313 the policy away. The agent's fraud having been admitted, the remedy of reformation was held appropriate; plaintiff was entitled to assume that the agent would convey to the carrier the truthful facts of his age and lack of driving experience, and was not required to scan the policy, and its many exclusions, to determine whether the agent had done so. In Heake the agent's admitted fraud induced issuance of a policy which denied the insured the very coverage he sought; he was afforded no coverage at all. In the present case the agent's fraud, found to exist by the trial judge, had no effect on the scope of coverage; ADB was rejected without action by the agent. Mullen's fraud affected only plaintiff's knowledge of the rejection, a fact freely available to the insured from the policy itself. Even in Heake the 17-year-old insured examined the declarations portion of the policy; in this case plaintiff, a business man with an accounting background, failed to do even that much and failed thereby to note the obvious absence of coverage he assumed was granted. These facts do not constitute the clear and convincing proof necessary for reformation.
As to equitable estoppel, the other remedy available for expanding an insurance company's liability beyond the limits of the policy issued, the elements thereof were described in Harr v. Allstate Ins. Co., supra, in the following terms:
These decisions [finding equitable estoppel] all proceed on the thesis that where an insurer or its agent misrepresents, even though innocently, the coverage of an insurance contract, or the exclusions therefrom, to an insured before or at the inception of the contract, and the insured reasonably relies thereupon to his ultimate detriment, the insurer is estopped to deny coverage after a loss on a risk or from a peril actually not covered by the terms of the policy. The proposition is one of elementary and simple justice. By justifiably relying on the insurer's superior knowledge, the insured has been prevented from procuring the desired coverage elsewhere. [54 N.J. at 306]
Hence, the two elements necessary to this theory are (1) a misrepresentation as to the fact or extent of coverage, innocent *314 or otherwise, by the insurer or its agent, and (2) reasonable reliance by the insured thereon to his ultimate detriment. Both elements are lacking by the undisputed proofs in this case. There was no representation by Mullen or defendant that the policy insuring Gallagher's life provided ADB coverage; plaintiff does not even contend there was. Further, there is no proof that the policy, lacking ADB coverage, would have been rejected; indeed, there is a strong suggestion in the record to the contrary. The prior policy did not contain ADB coverage. The application for the enlarged policy from Intercontinental which was withdrawn did not request ADB coverage. The policy which defendant issued, the one here involved, fulfilled the essential business purpose for which it was procured  funding the buy-sell agreement, and plaintiff admitted that much. Plaintiff had never taken the initiative with respect to insurance; such matters were left to Gallagher, the deceased partner, who insisted on obtaining coverage from defendant. The suggestion for ADB had come from Mullen, not from either of the partners. In short, there is nothing in this record which even suggests that ADB was such an essential term of the bargain with defendant, that coverage fulfilling the basic purpose for which the policy was sought would be rejected because ADB coverage was denied. Proof of the reliance element, the burden of which rested on plaintiff, was lacking.
The affirmative misrepresentation of the agent which eliminated the insured's duty to read the policy in Harr concerned the coverage of the policy; Harr held, in substance, that where an agent tells an insured that he is covered, the insured is entitled to rely on that representation and is not required to read the policy to detect an inaccuracy or a falsehood in the representation. Here, however, there was no representation as to ADB coverage and nothing upon which plaintiff could reasonably rely in assuming that the policy afforded that coverage. Mullen's fraud had no effect in inducing plaintiff to read, or refrain from reading, the policy; *315 as previously noted, plaintiff was at all times unaware of the forgery and indeed of the instrument to which his name was forged until after claim for ADB had been made. Contrary to the trial judge, we conclude that plaintiff could not assume, without reading the policy, that all of the requested coverage had been granted.
The policy did not afford ADB coverage and such coverage was never paid for. The coverage which was afforded fully met the business purpose for which it was purchased. Mullen's perfidy against plaintiff, the deceased, and his own company, the defendant, neither restricted coverage, nor induced plaintiff to read or not to read the policy. His failure to read the policy specifications was not excused and no basis for equitably estopping the company from asserting noncoverage has been shown.
Because of our disposition of this appeal, it becomes unnecessary to consider the issues raised in the cross-appeal.
The judgment is reversed and the cross-appeal dismissed.
NOTES
[1] Accidental Death Benefits, commonly referred to as double indemnity, would have provided double the face amount of the policy, $200,000, in the case of accidental death.
[2] In the absence of either of these two theories, an insured would be unable to recover on coverage never underwritten by the insurer and never paid for by the insured. Ordinary principles of contract would operate to defeat recovery. See, e.g., Interstate Life and Acc. Ins. Co. v. Flanagan, 284 So.2d 33, 36-37 (Miss. Sup. Ct. 1973), remarkably similar to the present case on its facts but decided without reference to either of these two theories expanding an insurer's liability beyond the undertaking reflected in the issued policy. Recovery was denied on ordinary principles of contract. Cf. Klos v. Mobil Oil Co., 55 N.J. 117, 123 (1969).