776 A.2d 792

BENJAMIN ADEN AND BEATRICE ADEN, PLAINTIFFS–APPEL-
LANTS, v. ROBERT F. FORTSH, DEFENDANT–RESPONDENT,
AND JOHL & COMPANY, INC., DEFENDANT.

Argued November 8, 2000—Decided July 18, 2001.

68

*Louis Smith* argued the cause for appellants (*LeBoeuf, Lamb, Greene & MacRae*, attorneys).

*Jared Stolz* argued the cause for respondent (*Methfessel & Werbel*, attorneys; *Jeffrey M. Patti*, on the letter in lieu of brief).

The opinion of the Court was delivered by

ZAZZALI, J.

The question presented in this appeal is whether a policyholder's failure to read his policy may be asserted as comparative negligence in a professional malpractice action against an insurance broker. In a published opinion, the Appellate Division reversed a jury verdict in favor of the insureds and held that the trial court should have instructed the jury on comparative negligence for the failure to read the policy. *Aden v. Fortsh,* 327 *N.J.Super.* 360, 743 *A.*2d 371 (App.Div.2000). We reverse. In New Jersey, the comparative fault defense traditionally "will not apply in a plaintiff's suit alleging a professional's malpractice, at least in those cases in which the defendant argues that the plaintiff was at fault in failing to understand or to perform the task for which the professional was hired." Brian E. Mahoney, *New Jersey Comparative Fault and Liability Apportionment* § 6:2–10 at 119 (2001). We now hold that the comparative negligence defense is unavailable to a professional insurance broker who asserts that the client failed to read the policy and failed to

detect the broker's own negligence. It is the broker, not the insured, who is the expert and the client is entitled to rely on that professional's expertise in faithfully performing the very job he or she was hired to do.

## I

In September 1994, Benjamin and Beatrice Aden purchased a $48,000 condominium in Sussex County. Prior to closing, Benjamin Aden (Aden), a retiree, contacted Robert Fortsh, an insurance broker, to request insurance coverage for the new condominium. Fortsh had been the Adens' broker since about 1979, selling them a variety of insurance policies, including auto insurance, life insurance, health insurance, and homeowners' insurance for their previous home. Although Aden and Fortsh agree that they spoke on two occasions regarding the new policy, the parties dispute the substance of those conversations.

Aden testified that he asked Fortsh for "a policy that would cover any losses I might have in my condo" and told Fortsh he wanted the equivalent of "a homeowners' policy which happened to be [for] a condo." Aden further testified that Fortsh asked him two questions regarding the policy during their first conversation in the beginning of August 1994: first, the amount Aden paid for the condominium, which Aden told him was $48,000; and, second, the worth of his personal contents in the condominium, which Aden estimated at $16,000.

Aden testified that in their second conversation Fortsh offered him a policy with an annual premium of $98. Aden stated that Fortsh neither explained what the policy covered nor advised Aden to verify that his condominium association insurance policy provided coverage for losses that the policy issued by Fortsh did not. Aden accepted the policy but testified that he did not read it when he received it.

Fortsh's description of events was markedly different. He testified that when Aden first contacted him about insuring the new condominium, Aden asked for the "minimum policy require-

ments." Fortsh also testified that he instructed Aden to contact his condominium association to discover what type of coverage the association provided because, in Fortsh's experience, some association policies cover damages to both the exterior of the condominium and the interior or "dwelling," obviating the need for unit owners to purchase dwelling coverage. He then offered Aden a policy with a $120 annual premium from Prudential. According to Fortsh, Aden rejected that policy as too expensive after he consulted with his neighbors in the condominium development. Because of his longtime business relationship with the Adens, Fortsh testified that he tried to obtain a cheaper policy from a different insurer, the Hartford Insurance Company, through a different broker, Johl & Company. Fortsh noted that ordinarily he would not have made additional efforts because the initial quote of $120 was relatively inexpensive. Fortsh also indicated that he would have received a slightly higher commission if he provided a Prudential policy rather than a Hartford policy.

Nevertheless, Fortsh contacted Aden and offered him the Hartford policy with the $98 annual premium. Fortsh testified that he then read a computer printout containing the policy limits and again advised Aden to consult the condominium association policy to ensure that anything not covered under the Hartford policy would be covered under the association policy. Although the Hartford policy was less expensive than the initial Prudential policy offered to Aden, Fortsh testified that the coverage was the same.

There is no dispute that in September 1994, Aden sent Fortsh a check for $98 for the Hartford premium, as well as written authorization for Fortsh to apply for the policy on behalf of Aden. Fortsh completed the application for the Hartford policy and signed it with Aden's permission. Aden was not sent a copy of the application. The policy issued to the Adens provided $1,000 in coverage in the event of damages to their dwelling.

On cross-examination, Fortsh conceded that he did not verbally review with Aden the specific amount of dwelling coverage. Rath-

er, Fortsh testified that when he returned the application for the Hartford policy, he left the box for dwelling coverage blank. The record is unclear with respect to how the amount of dwelling coverage became $1,000 under the policy since Fortsh left that portion of the application blank and the application itself is not included in the parties' appendices. In any event, Fortsh's deposition testimony, read to the jury during trial, indicated that he believed that dwelling coverage under the Hartford policy would be unnecessary because there should have been adequate coverage through Aden's condominium association policy. Fortsh testified that he himself never reviewed the condominium association policy to verify that belief. Fortsh also testified that he "assumed" that Aden read his association policy. The policy was renewed after a year.

In June 1996, a fire damaged the Adens' condominium. The damage caused to the exterior of the building was covered by the insurance provided under the condominium association policy. Nevertheless, Aden paid about $20,000 in repairs for damage to the interior of the building because, as noted, the Hartford policy provided for only $1,000 in dwelling coverage. Aden testified that he discovered the limited amount of coverage after the fire occurred, when he read his policy for the first time.

In October 1996, the Adens filed a complaint in the Law Division against Fortsh and Johl & Company for negligently failing to procure adequate insurance on the condominium. Prior to trial, the Adens settled with Johl & Company.

A two-day trial commenced in August 1998. In addition to the testimony of Aden and Fortsh, the jury heard from two expert witnesses. Plaintiffs' expert, Debra Stanton, an insurance agent, testified that the generally-accepted procedure by which an insurance broker procures a condominium insurance policy for a client is to review the insured's condominium association policy beforehand to determine what "the condominium association is agreeing to cover versus what they're making the unit owner responsible to cover." To that end, according to Stanton, a broker either should

ask the client to obtain a copy of the condominium's master deed, or should directly contact the association to obtain the master deed which would indicate the coverage contained in the association policy.

Stanton testified that many, if not the majority of association policies will provide coverage for the exterior of the condominium but not the dwelling. If a copy of the association policy was not readily available, Stanton testified that her company would require the insured to purchase at least $10,000 worth of coverage. Because Fortsh did not review the Adens' master deed before procuring the policy, it was Stanton's opinion that he did not act in conformance with industry standards.

Defendant's expert, Armando Castellini, a licensed broker, testified that Fortsh acted in conformance with industry standards. Castellini testified that by advising Aden to review the master deed to find out whether there were any further insurance requirements, as Fortsh claimed to have done, Fortsh did what was expected of him. Furthermore, Castellini stated that it was not a prerequisite for a broker such as Fortsh to review the Adens' master deed prior to securing coverage for them. Had Fortsh failed to advise Aden to review the master deed, Castellini conceded that Fortsh would not have met industry standards. Conversely, if Fortsh attempted to review the master deed, Castellini claimed that would have been an inappropriate "attempt to interpret legal documents." Castellini also testified that if the dwelling coverage limits of the Adens' policy were increased to $48,000, the annual premium would have risen to $296 per year.

At the conclusion of the trial, the court charged the jury in part that the law

imposes on the insurance broker the duty or obligation to have and to use that degree of skill and knowledge which insurance brokers of ordinary ability and skill possess and exercise in the representation of a client, such as the plaintiff Aden in this case. This is the standard by which to judge the defendant Fortsh in his placement and advice as to the insurance on this dwelling, condominium dwelling unit.

. . . .

> To find proximate cause it is not necessary that the negligence of the defendant Fortsh be the sole cause of the plaintiff Aden's harm. The law recognizes that in the case of insurance malpractice, there may be any number of factors that led to the plaintiff's harm. However, in order for the defendant Fortsh's conduct to be considered a proximate cause of the plaintiff Aden's harm, the negligence of the defendant Fortsh must have been a substantial factor in bringing about that harm or loss.
>
> . . . .
>
> Now, defendant has offered testimony that the plaintiff Aden's own actions or inactions were the sole proximate cause of having virtually no interior structural and fixture insurance coverage for the fire damage to his condominium. If you find that defendant has proven by a preponderance of evidence that plaintiff was the sole proximate cause of this lack of insurance coverage, you will find in favor of defendant and dismiss plaintiff's case.
>
> On the other hand, if you find that the plaintiff has proven by a preponderance of evidence the negligence of the defendant in providing inadequate and incomplete advice and procurement of insurance coverage, and that that was a substantial factor in bringing about the losses that occurred, and that some harm to the plaintiff was foreseeable from the defendant Fortsh's negligence, then you will find in favor of plaintiff.

Defense counsel had requested the court to charge the jury that "an insured is chargeable with knowledge of the contents of a policy" and that "an insured is chargeable with knowledge of the contents of a policy in the absence of fraud or inequitable conduct on the part of the insurer." The court, however, declined to accept that recommended charge. We accept, for purposes of this appeal, defense counsel's assertion that the recommended charge represented a request for an instruction in respect of comparative negligence.

During deliberations, the jury requested clarification on the meaning of proximate cause. In response, the court read back that portion of its instructions. The jury ultimately returned a unanimous 7–0 verdict in favor of the Adens. The parties had stipulated damages in the amount of $18,566. After calculating pre-judgment interest, the trial court entered judgment in the amount of $20,877. The Appellate Division reversed, holding that the trial court erred in refusing to instruct the jury with respect to Aden's failure to read the policy. This Court granted certification. 164 N.J. 561, 753 A.2d 1154 (2000). We now reverse the judgment of the Appellate Division and reinstate the verdict.

## II

Our Legislature abolished contributory negligence in favor of the doctrine of comparative fault by adopting the Comparative Negligence Act, *L.* 1973, *c.* 146. Section two of the Act currently states that in all negligence actions jurors are responsible for determining "[t]he extent, in the form of a percentage, of each party's negligence or fault." *N.J.S.A.* 2A:15–5.2. The Act applies to strict liability and negligence actions, including "civil actions for damages based upon theories of negligence, products liability, [and] professional malpractice whether couched in terms of contract or tort and like theories." *Ibid.* However, unlike the comparative negligence statutes of other states, our Legislature decided against requiring jurors, *and only jurors*, to resolve allegations of the plaintiff's negligence. *Vega ex rel. Muniz v. Piedilato*, 154 *N.J.* 496, 529, 713 *A.*2d 442 (1998). Rather, the Legislature allowed our courts to retain the authority to establish a "policy-based preclusion" of the factfinder's consideration of the plaintiff's conduct. Mahoney, *supra*, § 5:7–1a at 86.

In recent years, the application of that policy-based preclusion has been most apparent in professional malpractice cases. Actions involving a breach of professional duty are not everyday negligence claims—they involve obligations arising from special relationships. Five years ago, a unanimous Court in *Conklin v. Hannoch Weisman*, 145 *N.J.* 395, 412, 678 *A.*2d 1060 (1996), observed that, "when the duty of the professional encompasses the protection of the client or patient from self-inflicted harm, the infliction of that harm is not to be regarded as contributory negligence on the part of the client." The view that comparative or contributory negligence generally may not be charged when a professional breaches his or her duty to a client reflects our heightened expectations of professional services in this State. *See, e.g., Conklin, supra*, 145 *N.J.* at 412, 678 *A.*2d 1060 (holding injured party's negligence not relevant in attorney malpractice action); *Tobia v. Cooper Med. Ctr.*, 136 *N.J.* 335, 341, 643 *A.*2d 1 (1994) ("[W]hen a tortfeasor's duty includes exercise of reasonable

care to prevent a party from engaging in self-damaging conduct, contributory negligence is barred as a defense."); *Cowan v. Doering*, 111 *N.J.* 451, 464–65, 545 *A.*2d 159 (1988) (holding that health-care professionals could not assert contributory negligence defense against suicidal patient); *Mitchell v. Procini*, 331 *N.J.Super.* 445, 457, 752 *A.*2d 349 (App.Div.2000) ("Usually, comparative fault is not an issue in medical malpractice actions. . . ."); *Hofstrom v. Share*, 295 *N.J.Super.* 186, 193, 684 *A.*2d 981, (App.Div. 1996) (observing "particularly acute danger" in permitting jury to focus on plaintiff's alleged comparative negligence in professional negligence action), *certif. denied*, 148 *N.J.* 462, 690 *A.*2d 610 (1997); *Bryant v. Calantone*, 286 *N.J.Super.* 362, 371–72, 669 *A.*2d 286 (App.Div.1996) (same); *Conforti & Eisele v. John C. Morris Assocs.*, 199 *N.J.Super.* 498, 501, 489 *A.*2d 1233 (App.Div.1985) (noting that plaintiff's conduct did not constitute negligence in suit against design professionals); Pressler, *Current N.J. Court Rules*, comment 8.6 on *R.* 4:5–4 (commenting that comparative negligence defense "not so chargeable where the attorney's obligation was to protect the client from the self-inflicted harm that ensued").

■ That is not to say that the conduct of the client in a professional malpractice action is irrelevant in other respects. Illustratively, *Conklin* noted that in an attorney malpractice action, "if a client or patient deliberately violates the professional's instructions with respect to self-care or heedlessly enters a transaction regardless of any instructions on the part of the professional, the trier of fact may find that there is no causal connection between the fault and the harm, *Lamb v. Barbour*, 188 *N.J.Super.* 6, 12–13, 455 *A.*2d 1122 (App.Div.1982) . . ., *certif. denied*, 93 *N.J.* 297, 460 *A.*2d 693 (1983), or that the plaintiff failed to mitigate her damages as she should have, *e.g., Ostrowski v. Azzara*, 111 *N.J.* 429, 445, 545 *A.*2d 148 (1988)." 145 *N.J.* at 413, 678 *A.*2d 1060. *See also McLister v. Epstein & Lawrence, P.C.*, 934 *P.*2d 844, 846–47 (Colo.App.1996) (noting that client's alleged negligence in professional malpractice action "relevant to the issue of causation, but would not present a proper basis for a comparative negligence

instruction"). Thus, if the conduct of the client, rather than that of the professional, was the sole proximate cause of the alleged tort, a jury may conclude that the professional is not liable.

 Similarly, comparative negligence principles may be applied in professional malpractice claims in which the client's alleged negligence, although not necessarily the sole proximate cause of the harm, nevertheless contributed to or affected the professional's failure to perform according to the standard of care of the profession. *Steiner Corp. v. Johnson & Higgins*, 996 *P*.2d 531, 532 (Utah 2000). *See also Scioto Mem. Hosp. Ass'n. v. Price Waterhouse*, 74 *Ohio St.*3d 474, 659 *N.E.*2d 1268, 1274 (1996) (Cook, J. concurring) (noting that in accounting malpractice action "comparative negligence may be applied only to negligent acts of a client that contribute to the accountant's failure to perform according to the standards of the accounting profession. Other negligence by the client . . . is to be considered in the context of whether [the] damages proximately resulted from its own conduct. . . ."). *Cf. Rosenblum v. Adler*, 93 *N.J.* 324, 350–51, 461 *A.*2d 138 (1983) (observing in professional malpractice action that "[n]egligence of the injured party could bar or limit the amount of recovery under the Comparative Negligence Act"). Thus, if a client impedes the professional in his or her performance by, for example, withholding or failing to provide certain information to the professional concerning the matter for which the professional was hired that could have reduced a portion of the harm committed, the client's conduct may constitute comparative negligence unless the professionals' scope of employment included an obligation to prevent such conduct on the part of the client. See Hawkins, *Professional Negligence Liability of Public Accountants*, 12 *Vand. L.Rev.* 797, 811 (1959) (noting that in accountant malpractice actions "[t]here can be nothing unreasonable about plaintiff's conducting his affairs on the assumption that defendant is doing his job properly" but that plaintiff's conduct is relevant if it "goes beyond passive reliance and actually affects defendant's ability to do his job with reasonable care") (footnote omitted). A

policy-based preclusion of the comparative negligence defense also may be unavailable depending on the level of knowledge the client has in the field of expertise of the particular professional. *Erlich v. First Nat'l Bank of Princeton*, 208 *N.J.Super.* 264, 302, 505 *A.*2d 220 (Law Div.1984). Moreover, the Comparative Negligence Act further serves to allocate fault among multiple defendants in professional malpractice cases. *Johnson v. American Homestead Mortg.*, 306 *N.J.Super.* 429, 432, 703 *A.*2d 984 (App.Div.1997).

 Nevertheless, professionals may not diminish their liability under the Comparative Negligence Act when the alleged negligence of the client relates to the task for which the professional was hired. That rule is premised on the heightened responsibilities of professionals in this State. Otherwise, the fiduciary relationship between the professional and the client may be undermined and professionals may be allowed to escape liability for their malpractice. As one commentator has accurately summarized our law, "[i]n general, the comparative fault defense will not apply in a plaintiff's suit alleging a professional's malpractice, at least in those cases in which the defendant argues that the plaintiff was at fault in failing to understand or to perform the task for which the professional was hired." Mahoney, *supra*, § 6:2–10 at 119.

### III

 The import of the fiduciary relationship between the professional and the client is no more evident than in the area of insurance coverage. Insurance intermediaries in this State must act in a fiduciary capacity to the client " '[b]ecause of the increasing complexity of the insurance industry and the specialized knowledge required to understand all of its intricacies.' " *Walker v. Atl. Chrysler Plymouth, Inc.*, 216 *N.J.Super.* 255, 260, 523 *A.*2d 665 (App.Div.1987) (quoting *Sobotor v. Prudential Prop. & Cas. Ins. Co.*, 200 *N.J.Super.* 333, 341, 491 *A.*2d 737 (App.Div.1984)); *see also N.J.A.C.* 11:17A–4.10 ("An insurance producer acts in a fiduciary capacity in the conduct of his or her insurance busi-

ness."). The fiduciary relationship gives rise to a duty owed by the broker to the client "to exercise good faith and reasonable skill in advising insureds." *Weinisch v. Sawyer,* 123 *N.J.* 333, 340, 587 *A.*2d 615 (1991).

Accordingly, an insurance broker who agrees to procure a specific insurance policy for another but fails to do so may be liable for damages resulting from such negligence. *Rider v. Lynch,* 42 *N.J.* 465, 476, 201 *A.*2d 561 (1964). Liability resulting from the negligent procurement of insurance is premised on the theory that a broker "ordinarily invites [clients] to rely upon his expertise in procuring insurance that best suits their requirements." *Id.* at 477, 201 *A.*2d 561. The concept is essentially one of professional malpractice. A broker engaged to obtain insurance must exercise reasonable skill and "is expected to possess reasonable knowledge of the types of policies, their different terms, and the coverage available in the area in which his principal seeks to be protected." *Id.* at 476, 201 *A.*2d 561. Furthermore, if a broker "neglects to procure the insurance or if the policy is void or materially deficient or does not provide the coverage he undertook to supply, because of his failure to exercise the requisite skill or diligence, he becomes liable to his principal for the loss sustained thereby." *Ibid.; see also Restatement (Second) of Agency,* § 401 (1957) ("An agent is subject to liability for loss caused to the principal by any breach of duty.").

Before the advent of comparative fault in New Jersey, this Court held that an insured's failure to read the policy did not constitute contributory negligence in an action seeking damages because of a broker's failure to procure appropriate insurance coverage. *Rider v. Lynch, supra,* 42 *N.J.* at 482, 201 *A.*2d 561. In *Rider,* an eighteen-year-old with a limited ability to read English told a broker that she needed auto insurance for a car owned by her fiancé who gave her permission to use the car while he was out of state. 42 *N.J.* at 470–71, 201 *A.*2d 561. The broker issued a nonowner's insurance policy to her but did not explain the limitations under such a policy, namely, that the policy covered only automobiles not regularly used by the insured or any relative.

*Id.* at 473–74, 201 *A*.2d 561. The coverage therefore was worthless to the woman and her family who planned to use the car on a regular basis, a fact the broker knew or should have known. *Id.* at 474, 201 *A*.2d 561. Neither the woman nor her step-father read the policy. *Id.* at 482, 201 *A*.2d 561. After her step-father was involved in an accident, the insurer denied coverage and the step-father brought suit on behalf of the daughter against the insurer and the broker. *Id.* at 468, 201 *A*.2d 561.

This Court reversed the dismissal of the plaintiff's claim against the broker, concluding that a factual question existed with regard to whether the broker breached his duty of care. The Court noted that because of the nature of the principal-agent relationship the broker was charged with the knowledge that the policy did not fit his client's need and, even if the broker was not aware of the limited policy coverage, he was under a duty to examine and reject the policy himself before delivering it to the woman. *Id.* at 481, 201 *A*.2d 561. The Court also observed:

> In passing, it should be said that failure of [the daughter] or the plaintiff to read the policy will not estop either of them from prosecuting a cause of action in negligence against [the broker]. Nor will such failure support a defense of contributory negligence. *In view of the relationship of principal and agent between [the daughter and the broker], she and her father were entitled to rely upon and believe that the broker had fulfilled his undertaking to provide the coverage impliedly agreed upon, and that the policy sent to them represented accomplishment of that undertaking.*
>
> [*Id.* at 482, 201 *A*.2d 561 (emphasis added).]

The *Rider* decision is based on the sound policy that an insured in this State is entitled to assume that a broker has performed his or her fiduciary duty. That duty is not diminished when a policyholder fails to detect the broker's breach of that duty. *Ibid.; see also Winans–Carter Corp. v. Jay & Benisch,* 107 *N.J.Super.* 268, 272, 258 *A*.2d 131 (App.Div.1969) (holding that plaintiff's failure to read fire insurance endorsement did not contribute to defendant-broker's nonperformance). Authoritative commentators on insurance law, leading jurisprudence encyclopedias, and other jurisdictions are in accord with that view. 12 Holmes, *Appleman on Insurance* 2d, § 87.3 (noting that allegations of failure to read policy "not really appropriate to insurance

agency and brokerage liability where the question is fundamentally whether, considering all the facts, did the insured have the right to rely on the agent or broker?"); 3 *Couch on Insurance* § 46:69 (3d ed.) ("The insured's failure to read the policy has traditionally been held not to be a defense to an action against the agent for failure to procure insurance, on the reasoning that the principal is entitled to assume that the agent performed his or her duty...."); 43 *Am.Jur.*2d Insurance § 141 ("[I]f an insurance agent or broker has failed to procure a policy which in terms and coverage is of the type specified by the insured, and the insured consequently suffers an uninsured loss, the agent or broker cannot successfully contend that he is relieved of liability by reason of any contributory negligence on the part of the insured in not having read and familiarized himself with the contents of the policy."). *See also Weinlood v. Fisher & Assocs.*, 26 *Kan.App.*2d 20, 975 *P.*2d 1226 (1999) (observing that insured not negligent in failing to examine application or policy and justified in assuming that it had been written as contemplated); *Grigsby v. Mountain Valley Ins.*, 795 *S.W.*2d 372, 373–74 (Ky.1990) (noting that insured cannot be contributorily negligent for failure to read or understand fire insurance coverage); *Stock v. ADCO Gen. Corp.*, 96 *N.M.* 544, 632 *P.*2d 1182 (App.), *cert. denied*, 96 *N.M.* 543, 632 *P.*2d 1181 (1981) (observing that trial court properly refused to adopt requested findings that insured's failure to read policy constituted contributory negligence); *Israelson v. Williams*, 166 *A.D.* 25, 151 *N.Y.S.* 679, *appeal dismissed*, 215 *N.Y.* 684, 109 *N.E.* 1079 (1915) (holding insured not negligent in failing to examine policy in negligence action against broker); Robin Cheryl Miller, *Annotation, Liability of Insurance Agent or Broker on Ground of Inadequacy of Liability Insurance Coverage Procured*, 60 *A.L.R.* 5th 165, 189–90, 1998 WL 329515 (1998) (discussing view that insured's failure to read policy generally not a defense).

IV

In view of New Jersey's tradition of holding insurance professionals and other fiduciaries to higher standards, we con-

clude that Aden's failure to read the insurance policy cannot be asserted as comparative negligence in an action against the broker for negligent failure to procure insurance. As the *Rider* Court recognized, insureds are "entitled to rely upon and believe that the broker had fulfilled his undertaking to provide the coverage ... agreed upon, and that the policy sent to them represented accomplishment of that undertaking." 42 *N.J.* at 482, 201 *A.*2d 561. To hold that an insured must read the policy, and therefore is not entitled to rely on the broker's expertise, is directly contrary to *Rider.* Such a holding also contradicts *Conklin* because it would make the insured responsible for "self-inflicted harm," despite the broker's express obligation to protect the insured from that harm.

This case demonstrates why a comparative negligence charge places undue emphasis on Aden's behavior rather than on Fortsh's negligence. By contacting Fortsh, Aden elected to obtain the services of a professional licensed by this State. Aden could have purchased his policy directly from the insurer. Brokers such as Fortsh, however, hold themselves out as having more knowledge than members of the public with regard to the insurance policies and coverage they procure. A broker is not an "order taker" who is responsible only for completing forms and accepting commissions. The expert testimony at trial, for instance, indicated that an insurance broker who elects to procure policies relating to condominiums has a duty to be aware that there is a strong possibility that the insured's condominium association may not provide coverage for the interior of the condominium. Aden's expert testified that it was Fortsh's duty, not Aden's, to ensure that the policy he was procuring for Aden provided a sufficient amount of dwelling coverage for the condominium. It was undisputed that Fortsh failed to meet that standard.

Our disposition does not prevent brokers from contending during trial that an insured's failure to read the policy severed the causal connection between the broker's fault and the insured's harm. That is precisely the argument defense counsel made in this case. The trial court did not preclude Fortsh from

presenting evidence to attempt to prove that Aden's admission that he did not read the policy until after the fire was the proximate cause of the harm. The jury, however, rejected defense counsel's argument, a rejection supported by the evidence. Aden, *even had he read the policy,* would have been entitled to assume that the $1,000 in dwelling coverage was sufficient coverage in light of Fortsh's professional obligation to ensure that the condominium association policy and the policy he was procuring for Aden, in the aggregate, provided adequate coverage. Aden's failure to read the policy could not logically have been termed the direct cause of the malpractice.

Furthermore, we are of the view that the Legislature has intended the Comparative Negligence Act to apply to the conduct of victims of professional malpractice, but only to the extent that such conduct substantially contributed to the defendant's nonperformance. *Winans–Carter, supra,* 107 *N.J.Super.* at 272, 258 *A.*2d 131. In this case, for instance, had Aden told Fortsh that his personal contents were worth less than they actually were, or had he provided wrong or inadequate information to Fortsh, a comparative negligence charge would have been appropriate to allow the jury to apportion fault or reduce the amount that Aden could recover as a result of such conduct. Here, however, Aden's conduct was sufficiently remote to preclude Fortsh from raising it as an affirmative defense. Further, there is no evidence that Aden possessed any specialized knowledge in the area of insurance.

Finally, it is "to the insured's advantage to read the policy and question the agent about its terms and conditions; the agent's reiteration that the requested risks are covered is strongly in the insured's favor in any later lawsuit." Couch, *supra,* § 46:69. Efforts on behalf of insureds to understand their policy remain an effective means of resolving insurance disputes before they reach the litigation stage. An insured who does not review his or her policy will forego such an advantage.

V

Our dissenting colleagues argue that *Rider* is no longer binding precedent because it was decided less than a decade before the Legislature adopted the Comparative Negligence Act. The dissent reasons that the *Rider* Court was concerned that a contrary result in that appeal would have subjected the plaintiff's action to the harsh doctrine of contributory negligence. New Jersey's current comparative negligence scheme, according to the dissent, counterbalances that concern.

When *Rider* was decided, however, the doctrine of contributory negligence was not as harsh as the dissent suggests. By that time, our courts were dissatisfied with the common-law view that recovery should be barred if a plaintiff's own conduct contributed to the harm "in any degree" or "in any way." Instead, we adopted the more enlightened view that a plaintiff's conduct must be a significant factor in causing the harm to preclude recovery. See *Kaufman v. Pennsylvania R.R. Co.*, 2 *N.J.* 318, 323–24, 66 *A.*2d 527 (1949) ("To preclude the plaintiff from maintaining the action his conduct must have been negligent, and his negligence must have contributed to the injury in such a way that if he had not been negligent he would have received no injury from the act of the defendant."); *Maccia v. Tynes*, 39 *N.J.Super.* 1, 6, 120 *A.*2d 263 (App.Div.1956) (stating that "a plaintiff's contributory negligence will not operate as a bar to his claim unless there is a causal relationship between it and the accident"). Under that interpretation of the contributory negligence rule, the plaintiff in *Rider* would not have been precluded from recovering, as her conduct was not a significant factor in causing her injury. In this case, for instance, the jury concluded that it was Fortsh's negligent conduct that was a substantial factor in causing the harm committed and rejected defendant's argument that Aden's failure to have read the policy was the proximate cause of that harm. Even assuming that the *Rider* Court was concerned in part that the plaintiff's ability to recover might be endangered under the old contributory negligence scheme, that concern would be equally applicable today.

The Comparative Negligence Act only partially abrogated the doctrine of contributory negligence. A plaintiff still cannot recover if his or her fault is found by the jury to be greater than that of the defendants. *N.J.S.A.* 2A:15–5.1.

There is a well-recognized presumption that the Legislature has not acted to adopt a statute that derogates from the common law. To so do, "the Legislature must speak plainly and clearly." *Campione v. Adamar of New Jersey, Inc.,* 155 *N.J.* 245, 265, 714 *A.*2d 299 (1998). The Legislature has not hesitated in the past to make such intentions evident. See *Nobrega v. Edison Glen,* 167 *N.J.* 520, 533, 772 *A.*2d 368 (2001) (discussing Legislature's explicit intent that New Residential Real Estate Off Site Conditions Disclosure Act reverse *Strawn v. Canuso,* 140 *N.J.* 43, 657 *A.*2d 420 (1995)).

Although the Legislature has acted to partially abrogate the doctrine of contributory negligence, the Legislature has not interfered with the authority of the judiciary to ensure that jurors can hold negligent professionals liable for services that were not properly performed. There is not the slightest indication that the Legislature intended to overrule *Rider, Cowan, Tobia, Conklin* or the long line of cases that have sanctioned the preclusion of the comparative negligence defense in professional malpractice cases. Thus, in professional malpractice actions since 1973, our courts have recognized comparative negligence principles, *Rosenblum v. Adler, supra,* 93 *N.J.* at 350–51, 461 *A.*2d 138, and yet have continued to preclude that defense when it was alleged that the plaintiff failed to ensure the performance of the task for which the professional was hired. *Cowan, supra,* 111 *N.J.* at 466, 545 *A.*2d 159.

What the dissent does not acknowledge is that the forceful principles espoused by Justice Francis in *Rider* do not relate to the harsh doctrine of contributory negligence. *Rider* is not superfluous. The essence of *Rider* is as convincing now as it was over thirty-five years ago: professional brokers hold themselves out as experts and should not benefit from the insured's failure to detect

negligence in the broker's field of expertise. The insured hires and pays the broker for exactly that service. Indeed, we hire professionals in this State with the confidence and expectation that they will successfully perform what they have promised to do in their area of expertise. To focus undue attention on the behavior of the victim of professional malpractice "can lead to the dilution or diminution of a duty of care" of professionals. *Cowan, supra,* 111 *N.J.* at 467, 545 *A.*2d 159. Removing the plaintiff's failure to detect the professional's negligence from the comparative negligence equation, in our view, is the most sensible solution to the question presented. Brokers still would be able to argue to the jury that the insured's failure to read the policy is relevant to the issues of proximate cause and damages.

In some actions against an insurance company, but not involving a broker, an insured may be charged with a responsibility to read the policy. *Sears Mortgage Corp. v. Rose,* 134 *N.J.* 326, 348, 634 *A.*2d 74 (1993); *Bauman v. Royal Indem. Co.,* 36 *N.J.* 12, 25, 174 *A.*2d 585 (1961). When one contracts with another, the contracting parties may have an obligation to read the contract because if they assent without so doing, they cannot later assert that their agreement was different from that expressed in writing. Even in the contract-reformation context, there are exceptions to the rule, as when an insured "in all likelihood, will not read [the policy] over again and may not fairly be expected to do so." *Bauman, supra,* 36 *N.J.* at 25, 174 *A.*2d 585. In any event, what distinguishes the situation in which an insured employs the assistance of a professional insurance intermediary is that the insured then has the right to rely on the skilled broker's presumed competence in executing the instructions given. *Franklin v. Western Pacific Ins. Co.,* 243 *Or.* 448, 414 *P.*2d 343 (1966). Unlike when an insured sues an insurer, in a malpractice suit a written contract is not being challenged. An insured who hires and pays a professional broker does so to reduce, if not eliminate, the risk that an inadequate policy will be procured.

## VI

We reaffirm New Jersey's longstanding tradition of holding professionals to high standards of care. *Rider* and *Conklin* are part of a series of cases that have held that a plaintiff's conduct cannot be charged as negligence in actions in which the plaintiff failed to detect error in the discharge of the very responsibility he or she hired a professional to perform. Despite major revisions to our system of tort reparation, our Legislature has not undertaken to modify the forceful principles espoused in those cases. In this case, Aden could have purchased a policy directly from the insurer. Instead, he elected to pay for the professional expertise of his long-time insurance broker. Accordingly, he should not be charged with ascertaining whether Fortsh properly followed his instructions. One court sums up the common-sense rationale that undergirds the rule:

> [W]hen a broker of repute is employed to effect an insurance against certain risks, the client is entitled to rely upon his instructions being properly carried out. It is no answer for the broker to say: 'I handed you the policy and you should have examined it and seen whether it gave you the protection you required.'.... Business could not be carried on ... if, when a person has been employed to use care and skill with regard to a matter, the [client] is bound to use his own care and skill to see whether the person employed has done what he was employed to do.
>
> [*Hampton Roads Carriers v. Boston Ins. Co.*, 150 *F.Supp.* 338, 343–44 (D.C.Md. 1957) (quoting *Arnould on Marine Insurance* 160 (13th ed., 1950)).]

Insurance consumers who instruct their brokers to provide coverage are entitled to have those instructions followed without regard to the insured's failure to detect the broker's negligent conduct.

Reversed.

VERNIERO, J., dissenting.

In this broker malpractice action, the Court holds that the jury is forbidden as a matter of law from considering the possible comparative negligence of plaintiffs in failing to read the declarations page of their insurance policy. That holding relieves an insured from having to take the minimal step of reviewing a policy's one or two-page declarations sheet to avoid the kinds of injuries that occurred here. The majority's approach also dilutes

the significance of a legion of cases in which courts have stressed the importance of having insurance policies written in clear, straightforward terms to aid policyholders in reading and understanding them. See *Harr v. Allstate Ins. Co.*, 54 *N.J.* 287, 304, 255 *A.*2d 208 (1969) (emphasizing insurer's "obligation to make policy provisions, especially those relating to coverage, ... plain, clear and prominent to the layman"). Because I do not subscribe to the Court's approach or the policy rationale on which it is based, I respectfully dissent.

I.

Prior to 1973, "New Jersey's common law doctrine of contributory negligence barred an injured plaintiff from tort recovery when the plaintiff's own conduct contributed 'in any degree' to the plaintiff's harm." Brian E. Mahoney, *New Jersey Comparative Fault and Liability Apportionment* § 1:1–2 at 6 (2001). The Legislature ameliorated the unfairness inherent in that rule when it enacted New Jersey's first comparative negligence statute. *L.* 1973, *c.* 146. See *Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 161, 406 *A.*2d 140 (1979) (tracing history of statute). That statute declared that "[c]ontributory negligence shall not bar recovery in an action by any person ... if such negligence was not greater than the negligence of the person against whom recovery is sought[.]" *L.* 1973, *c.* 146. Over the years, the Legislature has made numerous refinements to the statute, which has had the effect of superseding the common law. *Steele v. Kerrigan*, 148 *N.J.* 1, 15, 689 *A.*2d 685 (1997) (observing that comparative negligence statute "largely abrogated the common-law doctrine of contributory negligence").

The harshness of the common-law doctrine of contributory negligence led this Court in *Rider v. Lynch*, 42 *N.J.* 465, 482, 201 *A.*2d 561 (1964), to express the view that an insured's failure to read an insurance policy should not bar recovery against a broker for negligent procurement. In *Rider*, the plaintiff engaged an insurance broker to obtain automobile insurance. He bought the

policy procured by the broker, but did not read it until after he was involved in an automobile accident and learned that he was not covered under the policy. The Court observed: "In passing, it should be said that failure of ... the plaintiff to read the policy will not estop [the insured] from prosecuting a cause of action in negligence against [the broker]." *Ibid.* Without elaboration, the Court also stated that "such failure [will not] support a defense of contributory negligence." *Ibid.*

Plaintiffs' view, with which the Court is in substantial agreement, is that *Rider* continues to bar a trier of fact from considering an insured's degree of fault in the broker-malpractice context. I disagree. I have found no reported New Jersey case after 1973 that has cited *Rider* in support of plaintiffs' proposition. The lack of such case law convinces me that the Legislature's 1973 enactment of the comparative negligence statute rendered that aspect of *Rider* effectively void. *Rider* remains good law in respect of other propositions for which it is sometimes cited, namely, that insurance brokers are "required to have the degree of skill and knowledge requisite to the calling" and that brokers ordinarily invite their clients to rely on the brokers' expertise in procuring insurance that best suits their clients' needs. *Id.* at 476, 477, 201 A.2d 561. I intend no diminution of that standard. To the contrary, I share the sentiments expressed in *Weinisch v. Sawyer,* 123 *N.J.* 333, 340, 587 A.2d 615 (1991), in which the Court stated that "[a]gents, like brokers, are obligated to exercise good faith and reasonable skill in advising insureds."

In arguing that the trial court properly denied the comparative-negligence charge, plaintiffs also rely on *Conklin v. Hannoch Weisman,* 145 *N.J.* 395, 678 A.2d 1060 (1996). That reliance is misplaced. The facts in *Conklin* were complicated. The plaintiffs hired a law firm to help them with a land sale involving a purchase money mortgage, but when the other party to the contract went bankrupt, the plaintiffs lost their land and their money. *Id.* at 400–02, 678 A.2d 1060. The plaintiffs sued the law firm for failing to inform them accurately in respect of the subordination clause

contained in the mortgage. *Id.* at 402, 678 *A.*2d 1060. The law firm contended that the plaintiffs had understood fully what it meant to be subordinated on the mortgage and had contributed to their own vulnerable position. *Id.* at 403, 678 *A.*2d 1060. The Court held that the plaintiffs' possible negligence was not relevant in their malpractice action. *Id.* at 412, 678 *A.*2d 1060.

I interpret *Conklin's* holding to be limited by its unique facts. Unlike the majority, I would not extend that holding to the present circumstance. In contrast to *Conklin,* the facts in this case are straightforward. There is no dispute that plaintiffs did not read their policy or the declarations page until after the fire occurred. That the declarations page plainly sets forth the $1,000 coverage limit in an easy-to-read fashion is also uncontested. Had plaintiffs reviewed that page of the policy, they would have readily seen the limits of coverage. *Lehrhoff v. Aetna Cas. & Sur. Co.,* 271 *N.J.Super.* 340, 346, 638 *A.*2d 889 (App.Div.1994) (deeming declarations page "as having signal importance" in defining insured's expectations of coverage). Hence, this case implicates whether plaintiffs bore any responsibility prior to the fire to examine at least the policy's declarations page to determine if its terms were as the parties intended. *Cf. Martinez v. John Hancock Mut. Life Ins. Co.,* 145 *N.J.Super.* 301, 310, 367 *A.*2d 904 (App.Div.1976) (describing extent of duty of insureds to read policies), *certif. denied,* 74 *N.J.* 253, 377 *A.*2d 660 (1977).

## II.

I would hold that in malpractice actions involving agents, brokers, or similar parties, the trier of fact is generally required to determine the degree of an insured's negligence or fault in failing to read a policy's declarations page. I would confine that holding to the declarations page because, as noted, that page has "signal importance" in defining an insured's expectation of coverage. *Lehrhoff, supra,* 271 *N.J.Super.* at 346, 638 *A.*2d 889. My intended disposition would in no way alter existing requirements in respect of personal injury protection coverage contained in Title

39 or lessen the responsibilities appropriately placed on insurance professionals.

I also would reaffirm a trial court's ability to determine as a threshold matter whether the jury's involvement is warranted by the facts of a particular case. In that regard, when justified under the totality of the facts, a trial court is free to conclude in any action that no reasonable jury could find a policyholder to be at fault. If the court so concludes, it need not charge comparative negligence to the jury. *Vega by Muniz v. Piedilato,* 154 *N.J.* 496, 529, 713 *A.*2d 442 (1998) (Handler, J., concurring) (observing that trial courts retain discretion to determine fault issue because New Jersey's comparative negligence statute does not mandate that jury must evaluate plaintiff's alleged negligence in all instances). In short, I would leave undisturbed a court's inherent authority to determine the applicability of comparative negligence in a given case.

In carrying out its required tasks, the jury does not perform in a vacuum. Instead, it considers all relevant circumstances related to the broker-client relationship. In so doing, the jury may decide that the extent of the insured's fault in failing to read the policy's declarations page is relatively small as compared to the negligence of the broker, or that the insured is not at fault at all. Particular to this case, for example, the jury would consider whether the broker failed to advise his clients adequately by not reviewing their master deed or association policy before obtaining plaintiffs' policy.

Consequently, I would not relieve the broker of any affirmative obligation to act in accordance with industry standards. In determining a party's degree of fault, jurors would be able to consider the disparity in sophistication between the insured and the broker, the failure of the broker to gather the facts necessary to assess the client's coverage needs, or any other relevant factor. The Supreme Court of Oregon has articulated a similar view:

> Insureds and insurance policies are not all alike. Insureds range from unsophisticated individuals who know nothing about insurance, to experienced business

persons knowledgeable about insurance, to large corporations with batteries of lawyers. The relevant provisions of the policy may be simple (the address of the insured premises, for example) or complex. A jury should be allowed to consider two questions: Under the relevant circumstances, was it unreasonable in the light of foreseeable risks for the insured not to read the policy? If so, did the insured's unreasonable failure to read the policy contribute to the insured's damages?

[*Martini v. Beaverton Ins. Agency, Inc.*, 314 *Or.* 200, 838 *P.*2d 1061, 1067 (1992).]

Implicit in that approach is an abiding faith in jurors. Along those lines, this Court observed recently "that jurors are persons of good faith, that they strive to fulfill their role without passion or prejudice toward either side, and that they work hard to abide by all instructions to the best of their ability." *Wanetick v. Gateway Mitsubishi*, 163 *N.J.* 484, 494, 750 *A.*2d 79 (2000). I see no compelling reason to justify shielding jurors from the possible comparative negligence of an insured under the circumstances presented here.

### III.

Our jurisprudence properly insists that fiduciaries, on whom members of the public rely for services and advice, conduct themselves with diligence and care. "One who holds himself out to the public as an insurance broker must exercise reasonable skill, care, and diligence in the execution of his responsibilities." *Aden v. Fortsh*, 327 *N.J.Super.* 360, 366, 743 *A.*2d 371 (App.Div. 2000) (citing *Rider, supra*, 42 *N.J.* at 476, 201 *A.*2d 561). We need not choose, however, between the twin aims of enforcing those professional standards and encouraging insureds to read the declarations page of their policies to avoid harm. By applying concepts of comparative fault, our jurisprudence can fairly accommodate both objectives.

My sense from the record is that if plaintiffs had read only the two-page declarations sheet attached to their policy, they likely would have avoided not only their damages but also the burdens of this litigation. Those burdens have been felt by the parties and the system as a whole in the form of counsel fees, court costs, and clogged dockets. The Court should recognize the applicability of

comparative negligence in this instance as it has in other cases involving professional malpractice. *See, e.g., Rosenblum v. Adler,* 93 *N.J.* 324, 350-51, 461 *A.*2d 138 (1983) (observing in negligence suit against accounting firm that "[n]egligence of the injured party could bar or limit the amount of recovery"). Such an approach would have the salutary effect of encouraging policyholders to read the declarations page of their insurance policies. That, in turn, would avoid legal wrangling and help prevent the kind of damages that resulted here.

That New Jersey has grappled with the high costs of insurance is no secret. *See, e.g., In re Am. Reliance Ins. Co.,* 251 *N.J.Super.* 541, 545, 598 *A.*2d 1219 (App.Div.1991) (outlining history of New Jersey's "intractable" automobile insurance problems), *certif. denied,* 127 *N.J.* 556, 606 *A.*2d 369 (1992). In a state in which such costs are a perennial problem, sound public policy requires that insureds be encouraged to take the minimal step of reviewing the declarations page of their policies to avoid the injuries and disputes associated with having inadequate coverage. Expecting policyholders to exercise that minor degree of personal responsibility in this setting is both reasonable and fair.

Some insurance policies are so complicated, ambiguous, or confusing that insureds cannot be faulted for their failure to read even the declarations page. I reiterate that in such instances trial courts may withhold from the jury questions about which no reasonable juror could disagree, including those concerning comparative fault. Mahoney, *supra,* § 5:2-2 at 69 ("The issue of comparative fault will be submitted to the trier of fact only when the defendant presents sufficient evidence of the plaintiff's fault or other misconduct."). Under those circumstances, I am satisfied that our affirming the judgment below would place no undue burden on policyholders and would not dramatically alter existing litigation practices.

Lastly, in the absence of a comparative negligence charge, the jury in this case was left with the impression that "it had to find that plaintiffs were the *sole proximate cause* of their loss before it

could find in favor of defendant." *Aden, supra,* 327 *N.J.Super.* at 368, 743 *A.2d* 371. I agree with the Appellate Division that "the jury could have been confused and misled by this one-sided instruction[,]" and that the instruction did not accurately represent the current state of the law. *Ibid.*

## IV.

For the reasons stated, in addition to those set forth in Judge Eichen's persuasive opinion below, I would affirm the judgment of the Appellate Division.

Justices COLEMAN and LaVECCHIA join in this opinion.

*For reversal*—Chief Justice PORITZ and Justices STEIN, LONG and ZAZZALI—4.

*For affirmance*—Justices COLEMAN, VERNIERO and LaVECCHIA—3.