951 A.2d 198 (2008)
401 N.J. Super. 354
HARBOR COMMUTER SERVICE, INC., Harbor Shuttle Inc., Walter Mihm and Stanis B. Mihm, Plaintiffs-Respondents,
v.
FRENKEL & CO., INC., McCue Captains Agency, Inc., and AON Risk Services, Inc. of Ohio, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued June 3, 2008.
Decided July 2, 2008.
*199 Constantine L. Trela, Jr. (Sidley Austin) of the Illinois bar, admitted pro hac vice, Chicago, IL, argued the cause for appellant, AON Risk Services, Inc. of Ohio (Evans, Osborne & Kreizman, Ocean and Mr. Trela, attorneys; Mr. Trela and Harry V. Osborne, II, Ocean, of counsel; Mr. Osborne, on the brief).
James W. Carbin, Newark, argued the cause for appellant, Frenkel & Co. Inc. (Duane Morris and Caryn L. Lilling (Mauro Goldberg & Lilling), Great Neck, NY, attorneys; Ms. Lilling and Mr. Carbin, of counsel and on the brief).
Christopher P. Leise, Cherry Hill, argued the cause for appellant, McCue Captains Agency, Inc. (White and Williams, attorneys; Mr. Leise and Edward M. Koch, Philadelphia, PA, on the brief).
Melvin Greenberg, Newark, argued the cause for respondents (Greenberg Dauber Epstein & Tucker, attorneys; Mr. Greenberg and Sumeeta A. Gawande, on the brief).
Gilbert S. Leeds, Morristown, argued the cause for amicus curiae, Independent Insurance Agents & Brokers of New Jersey and Professional Insurance Agents of New Jersey (Schenck, Price, Smith & King, attorneys; Mr. Leeds and Jeffrey T. LaRosa, of counsel; Michael G. Serafino, on the brief).
Before Judges SKILLMAN, WINKELSTEIN and YANNOTTI.
The opinion of the court was delivered by
WINKELSTEIN, J.A.D.
Plaintiffs operated commuter ferry routes across New York Harbor. Intending to commence service from Great Kills, Staten Island, to Manhattan, they purchased a high speed ship from a Louisiana shipyard for $650,000. They financed the purchase with a $4.2 million loan secured by a mortgage on their entire fleet of vessels. Plaintiffs subsequently defaulted under the terms of the mortgage.
This lawsuit involves plaintiffs' claim against three insurance brokers, defendants Frankel & Co., McCue Captains Agency, and AON Risk Services (previously known as Alexander & Alexander). Plaintiffs claim that defendants breached their fiduciary duties by failing to inform plaintiffs that they were not covered by the lender's breach of warranty insurance, and by not otherwise obtaining breach of warranty coverage for plaintiffs.
The trial court denied defendants' motions for summary judgment, and concluded *200 that defendants owed a duty to plaintiffs, breached that duty, and the breach of duty proximately caused plaintiffs' damages. Following a damages trial, the jury returned a $6.45 million verdict for plaintiffs. After increasing the damages award based on the offer of judgment rule, Rule 4:58, the court entered a judgment against defendants, jointly and severally, in the sum of $9,111,705.74.
Defendants have appealed from that judgment and we reverse. Because we conclude that defendants were entitled to summary judgment, we do not address the issues defendants have raised related to the trial.

I.
Plaintiffs Harbor Commuter Service and Harbor Shuttle (collectively, Harbor), New Jersey corporations, were engaged in commuter ferry operations. Plaintiff Walter Mihm was the principal and sole shareholder of each company.
Harbor Commuter was incorporated in 1986, and Harbor Shuttle was incorporated in 1990. By 1994, Harbor's fleet consisted of five 150-passenger vessels. In 1996, Mihm planned to initiate a new ferry route between Great Kills, Staten Island and Pier 11 in Manhattan, using a 109-foot high-speed "surface effective ship," known as the SES 109, which had a 350-passenger capacity. Harbor intended to purchase the vessel from Avondale Industries in Louisiana for $650,000 on an "as is where is" basis. Harbor sought to finance the purchase through Debis[1] Financial Service. In 1995, Debis had provided financing for two of Harbor's 150-passenger ferries. In acquiring the new vessel, Harbor sought to refinance its existing $479,931 debt with Debis and increase it to $4.2 million. Harbor used its entire fleet, valued at $7,470,000, as collateral.
In connection with Harbor's refinancing application, it presented Debis with a $4.5 million sales invoice for the SES 109. According to Pamela Ivey, a Debis employee, Harbor represented the purchase price to be $4.5 million, not $650,000. Mihm claimed, however, that in a letter dated September 6, 1996, he advised Debis that he had been negotiating the purchase price of the SES 109, and "the purchase price for the vessel will drop to $650,000."
The loan apparently closed on October 16, 1996. Mihm, on behalf of Harbor, executed a $4.2 million mortgage in favor of Debis. The provisions of the mortgage that are pertinent to plaintiffs' claims here are sections II.4 and II.5, "WARRANTIES; AGREEMENTS." Those sections include an insurance provision, which, as pertains to this lawsuit, required Harbor to obtain hull insurance and breach of warranty insurance. Hull insurance insures both the mortgagor and the mortgagee against the specific risks enumerated in the policy. In re ATCORP I, Inc., 25 B.R. 340, 342 (B.A.P. 1st Cir. 1982). Breach of warranty insurance "is a separate contract between the insurer and the mortgagee. . . . The breach of warranty coverage protects the interests of the [mortgagee] from policy defenses that the insurance company may have against the mortgagor." Ibid. (citing 5A Appleman, Insurance Law & Practice § 3401 at 282 (1970)). In other words, hull insurance protects the interests of both the borrower and the lender, and breach of warranty insurance protects only the lender's interests.
The mortgage specifically provided as follows:

*201 II.4 Insurance on Vessels. Owner shall procure and maintain . . . the following insurance:
(a) Full Form Hull and Machinery Insurance in an amount not less than the true market value of each Vessel, . . . Mortgagee shall be named as an additional insured and any loss shall be payable to Owner and Mortgagee as their interests may appear. This insurance must include a breach of warranty endorsement or a separate mortgagee's interest insurance policy so that the interests of Mortgagee shall not be impaired by any act, omission, neglect, or breach of warranty of the Owner.
. . . .
(d) Breach of Warranty Insurance for the full amount of the Note, in favor of Mortgagee.
The insurance specified in (a) . . . and (d) of this paragraph shall also be subject to the following terms:
. . . .
(f) In the event of [a loss] of a Vessel . . . the underwriters shall pay the insurance funds directly to Mortgagee . . . provided, however, that if no event has occurred that would constitute an Event of Default . . ., such proceeds shall be provided to Owner for the sole purpose of purchasing a vessel of similar function and value to the damaged Vessel. . . .
(g) All such insurance provided for herein (except for Workers' Compensation) shall name Mortgagee as a coinsured and shall expressly waive subrogation against Mortgagee.
. . . .
II.5 Compliance With Insurance and Legal Restrictions. Owner will not do any act, nor voluntarily suffer or permit any act to be done, whereby any insurance is or may be suspended, impaired, or defeated. . . .
The mortgage includes the following events of default:
III.1 Default in the timely payment of any amount due on the Debt . . . ;
III.2 Any representation, warranty, statement, certificate, schedule, or report made herein or furnished hereunder proves to have been false or misleading in any material respect when made;
. . . .
III.4 Default in the performance or observance by Owner of any covenant, warranty, promise, condition, agreement, or term contained herein . . . that is not remedied within thirty days after notice of such default to Owner by Mortgagee[.]
We turn next to the events that preceded the loan closing that relate to the procurement of the insurance. McCue Captains Agency was Harbor's insurance broker. In 1994, Robert Aitkens, a McCue employee, obtained hull and protection and indemnity (P & I) insurance for Harbor's commuter vessels through John Tilden Company, a division of Frenkel. Aitkens placed breach of warranty insurance for three of plaintiffs' five vessels through AON.
Prior to the closing of plaintiffs' loan from Debis, Mihm instructed Aitkens to obtain whatever insurance was necessary to close the loan and make the purchase. Accordingly, Aitkens approached AON to place the insurance. AON offered breach of warranty coverage through an entity known as HIH Marine, which would have charged a premium of fifteen cents per hundred dollars value. Mihm did not purchase breach of warranty coverage from AON, however, but instead purchased that coverage from Debis, based on a fax dated *202 October 4, 1996, from Pamela Ivey to Aitkens. It stated:
debis Financial Services . . . is providing permanent financing for [Harbor]. Kindly note our standard insurance requirements listed below, more specifically:
a. Hull and Machinery Insurance. debis Financial Services, Inc. to be named as Loss Payee in the amount of U.S. $7,470,000.00.
b. Protection & Indemnity Insurance. Minimum of U.S. $7,470,000.00 or for the total amount of the vessel, whichever is greater.
c. Breach of Warranty Insurance. [I]n the amount of U.S. $4,200,000.00 in favor of debis Financial Services, Inc.
Breach of Warranty (or "Mortgagee's Interest")  This type of coverage is, simply put, lender's insurance. Should the insured do anything which violates the parameters of the insurance coverage and which may render the coverage invalid, Breach of Warranty insurance coverage will pay the outstanding loan balance to the lender. This coverage is a requirement for our loan. If your agency does not write this coverage for some reason, kindly note that debis is now able to offer its customers Breach of Warranty insurance at the rate of $0.05 per $100.00 of loan value, calculated on a monthly basis.
The same day that Aitkens received the fax from Ivey, he faxed it to Virginia Cernik of AON under the following cover: "Please add SES Boat previously quoted effective the 19th. See Attached Specs from Finance Company. Can we comply?"
Although Aitkens was not certain if he had sent Mihm a copy of Ivey's fax, he testified at his deposition that he had spoken to Mihm in October 1996 about its contents. Aitkens told Mihm that breach of warranty coverage was being offered by Debis at a cheaper rate than AON's coverage. He spoke with "Mihm about the coverage and the understanding of what the coverages mean, and [Mihm] agreed that going through Debis was the best thing for him." Aitkens testified that he told Mihm, "the breach of warranty is offered to protect the lender's interests in the vessels, in the event that the named insured on the policy breaches warranties and voids whatever coverage is afforded under the policy, under the hull policy."
Mihm acknowledged that he had received a copy of the Ivey fax from Aitkens. Mihm understood that to obtain the loan, Harbor had to obtain breach of warranty coverage and that "Debis had to be on the policy." Because he opted to obtain that coverage through Debis, Frenkel, Debis's broker, added Harbor to an existing breach of warranty policy that Debis maintained with Commercial Union Insurance Company. Frenkel did not receive or review any of the financing documentation for the Debis loan to plaintiffs.
On October 14, 1996, Aitkens told Cernik to remove three of the five existing Harbor vessels from breach of warranty coverage that had been issued by Harbor's prior breach of warranty insurer, as that coverage for all Harbor vessels would subsequently be provided under Debis's policy. Aitkens did not review Debis's policy or speak to anyone at Debis about its terms.
As indicated previously, plaintiffs claim that defendants failed to inform them that breach of warranty coverage would not inure to plaintiffs' benefit. The relevant language of that policy, under its basic coverage provision, states:
It is understood and agreed, notwithstanding anything contained herein, this policy is extended to cover the Assured *203 [Debis] as a Lessor or Mortgagee (as their interest may appear), if the owner of the insured vessel [Harbor] does not provide coverage required in this policy [the hull insurance], but the extension shall not apply if there is a lack of due diligence by the Assured and/or their employees, and/or their agents to ascertain that the proper insurance is purchased and maintained by the vessel owner.
The policy also includes the following warranties:
a) Owner's policies [are] (primary coverage). . . .
b) The Assured must be named as a loss payee on the primary insurance.
c) Coverage in the primary insurance shall not be less than what is found in Section II, Paragraph 3A, "Hull and Machinery" and Paragraph 3B, "Protection and Indemnity".
d) Primary coverage shall be in amounts not less than the outstanding lease/mortgage, which amounts shall include . . . all . . . sums due with respect to the mortgages on the vessel.
. . . .
f) . . . It is further agreed that this insurance is not intended to inure to the benefit of the owner or other third parties; and it is agreed that the Assured shall not waive their rights of recovery as against the owner or other third parties to which such rights, in respect of the concerned vessels only, underwriters shall be fully subrogated upon payment of loss hereunder.
[(emphasis added).]
The policy gives the underwriters subrogation rights against Harbor: "[U]pon payment of any claim under this policy Underwriters hereon shall be fully subrogated to, the rights of the Assured to the extent of the claim against underwriters on the owner's policies, the Mortgagor, any Guarantor, or other security available to the Assured."
Section IV of the policy, the breach of warranty section, states, in part:
[T]his policy shall indemnify the mortgagee. . . . In the event of a loss of, or damage to, or liability arising from the insured vessel, and after a final court judgement, by underwriters of the owner's policy or policies arising from:
A) BREACH OF WARRANTY  Non-payment by vessel owner's or lessee's Underwriters for any loss, damage or expense occurring or arising during the terms of this policy, which non-payment results from any breach of warranty, express or implied, in the owner's or lessee's policy.
To secure hull insurance for the trip from Louisiana to New York, Harbor informed AON that the purchase price of the vessel was $4 million and the market value was $5.1 million. Mihm subsequently supplied Cernik with a document dated October 18, 1996, on the letterhead of Faulkner Marine Sales, and addressed to Harbor, that stated: "TO INVOICE YOU FOR THE PURCHASE OF THE SES 109 AS PER OUR AGREEMENT  TOTAL DUE $5,100,000.00." Cernik faxed this document to Royal Insurance Company, which issued a hull policy in November 1996 covering the SES 109 for its trip from Louisiana to New York.
Mihm retained Daniel Washburn to pilot the SES 109 from the Avondale shipyard to New York. When Washburn arrived to transport the vessel, it was "in pretty poor shape." The engines needed extensive servicing, and the bilge system was not operating properly.
After temporary repairs were completed, on November 13, 1996, the vessel left *204 Louisiana for New York. On December 1, 1996, the vessel's engine overheated, and as a result, the ship ran aground. It was temporarily repaired, and completed the trip. When it reached New York, plaintiffs claim that an inspection revealed extensive structural damage, and the vessel was declared "a constructive total loss."
Consequently, on February 3, 1997, Harbor made a claim on the Royal hull policy for damage to the vessel as a result of the grounding. Royal declined coverage and commenced a federal declaratory judgment action against Harbor seeking a ruling that the policy be declared void.
On July 8, 1997, both Harbor entities filed Chapter 11 bankruptcy petitions. Although Harbor had entered into a lease for docking facilities for the SES 109 at Great Kills, neither Harbor nor the lessor, Atlantis Marina and Yacht Club, had obtained permits for the proposed ferry service. In an affidavit appended to Harbor's bankruptcy petition, Jonathan Mende, Harbor's Vice President, verified that Harbor was unable to obtain permits for its proposed ferry operation. He said that "the necessary permits and licenses had not been obtained by [Atlantis] and [Harbor] was prohibited from operating its commuter ferry service."
On January 18, 1999, the federal district court declared the Royal policy void ab initio. Among the reasons provided by the court for its decision was Harbor's misrepresentation of the purchase price to Royal. The court found that Harbor failed to present evidence of why its application for hull insurance included an incorrect purchase price for the SES 109. During the court proceeding, Harbor conceded that Royal's summary judgment motion to void the policy should be "granted in all respects."
Following the district court's order voiding the hull policy, on September 30, 1999, Frenkel, on behalf of Debis, presented a claim to International Marine Underwriters (IMU), a division of Commercial Union, under the breach of warranty policy. Debis sought to recover the cost of repairs to the vessel due to the grounding, in the sum of $3,463,257.90. IMU declined coverage for several reasons, one being that the underlying hull policy had been voided.
In February 2000, seeking the balance on the note and punitive damages, Debis sued plaintiffs, Mihm's family members, and his affiliated business entities in federal court. Debis claimed that they breached the terms of the note and committed fraud in their application for financing, having represented that the SES 109 purchase price was $4.5 million. Subsequently, the case was settled by payment of $325,000 to Debis by Mihm and/or his affiliated businesses.
In this lawsuit, Harbor contends that defendants led it to believe that it was entitled to the proceeds under Debis's breach of warranty policy in the event the hull policy was uncollectible. Defendants moved for summary judgment, asserting that they owed no duty to Harbor with regard to the breach of warranty policy, in that they did not procure that policy for Harbor. They further asserted that even if they had such a duty, Harbor did not establish that defendants proximately caused Harbor's damages because breach of warranty coverage is not available to insure the vessel's owner, and even if it were, Harbor sustained damages because it could not obtain permits to conduct its ferry operations, not because of any action or inaction by defendants.
The first trial judge assigned to the case denied defendants' motions for summary judgment, but partially granted plaintiffs' cross-motions. The judge found that defendants owed a duty to inform Harbor *205 that it was not covered under the breach of warranty coverage purchased from Debis. It is unclear from the judge's written decision whether he ruled that any defendants breached that duty. The court did not state in its opinion that plaintiffs were entitled to summary judgment on the question of breach of duty as a matter of law, nor is similar language found in any of the four orders the court executed following its opinion, although one of those orders states that "plaintiffs' motion for summary judgment is hereby granted." Furthermore, the first judge did not make any findings on the issue of proximate cause.
Defendants subsequently renewed their summary judgment motions. They principally argued that even if they breached a duty to plaintiffs, plaintiffs failed to establish that defendants' breach proximately caused plaintiffs' damages. The second judge denied the motion relying on the law of the case doctrine.
A third judge was assigned to try the case. Addressing motions in limine, that judge ruled that the first judge "reduced this matter to a damages only trial and therefore reduced the issue of proximate cause by his opinion as well." The third judge said: "[I]f [defendants] have any affirmative defenses, they have effectively been quashed by [the first judge], if they do not relate to the quantum of damages. . . . This is a damages only trial. The duties have been decided. The breaches have been decided. Proximate cause has been decided."
As noted, following the damages trial, the court entered a $9,111,705.74 judgment against defendants.

II.
For a number of reasons, we conclude that defendants were entitled to summary judgment. We begin our discussion with the consequences of the federal district court's opinion that plaintiffs' misrepresentation in their application for hull insurance rendered that insurance void. In their arguments to this court, plaintiffs minimize the implications of their misrepresentation, appearing to assert that their activities with regard to the hull insurance are irrelevant to their claims against the insurance brokers with regard to the breach of warranty insurance. We disagree.
Had the Royal hull policy been in force, plaintiffs could have sought recovery under that policy for their damages. Coverage is unavailable under that policy, however, as a result of plaintiffs' misrepresentation. Thus, even assuming that defendants could have secured coverage for Harbor under a breach of warranty policy, because plaintiffs' misrepresentation caused the event that the breach of warranty insurance was designed to protect the lender against  the inability to recover under the hull policy  plaintiffs would nevertheless be estopped from recovering under that policy.
One of defendants' experts, John Klagholz, an insurance consultant, opined that "it would be [an] anathema to allow an insured to procure any form of insurance that would indemnify him in the event of a loss that was caused by or resulted from the insured's own breach of a material warranty, thereby rewarding him for his own impermissible acts." We agree with Klagholz that an insured cannot be allowed to obtain insurance that would protect him if a loss is caused by, or results from, the insured's own breach of a material warranty, thus rewarding him for his own improper actions. In other words, plaintiffs' own tortious conduct would preclude coverage under a breach of warranty policy, regardless of what the insurance brokers told plaintiffs about the availability of the coverage. *206 See Carlsen v. Masters, Mates & Pilots Pension Plan Trust, 80 N.J. 334, 339, 403 A.2d 880 (1979) ("Conduct amounting to a misrepresentation . . . known to the party allegedly estopped and unknown to the party claiming estoppel, done with the intention or expectation that it will be acted upon by the other party and on which the other party does in fact rely in such a manner as to change his position for the worse gives rise to an equitable estoppel."). Put simply, plaintiffs would be equitably estopped from benefiting from their own misrepresentation.
Plaintiffs' failure to maintain hull insurance also constituted a default under the mortgage with Debis. In the absence of hull insurance, plaintiffs' default made the breach of warranty insurance available to Debis to satisfy plaintiffs' obligation under the mortgage. The breach of warranty policy included a subrogation clause in favor of the insurer. Thus, if the insurer had paid Debis's claim, it would have had a right of recovery against Harbor, both for Harbor's actions that rendered the underlying hull policy uncollectible, and for Harbor's loan obligation to Debis.[2] In no event would the proceeds of the breach of warranty insurance have been paid to plaintiffs.
Other reasons exist as to why plaintiffs' complaint should not have survived summary judgment. One is that plaintiffs have not established that the insurance brokers, with the possible exception of McCue, owed them a duty with regard to plaintiffs' procurement of the breach of warranty insurance.
Insurance brokers stand in a fiduciary capacity with their clients, to whom they owe a duty to exercise reasonable skill and good faith. Aden v. Fortsh, 169 N.J. 64, 78-79, 776 A.2d 792 (2001). "[A]n insurance broker who agrees to procure a specific insurance policy for another but fails to do so may be liable for damages resulting from such negligence." Id. at 79, 776 A.2d 792.
Harbor appears to claim that section II.4(g) of its mortgage with Debis establishes a duty owed to it by all defendants, in that it provides that Harbor shall be named as a coinsured or a loss payee under the breach of warranty policy. That argument is without merit. In addition to the fact that Harbor defaulted under the mortgage, the mortgage was between Harbor and Debis; defendants were not parties to the mortgage. The mere existence of that provision in the mortgage placed no duty upon any defendants with respect to Harbor's procurement of the breach of warranty coverage.
Further, the record does not otherwise establish that AON or Frenkel owed a duty to plaintiffs with regard to the breach of warranty coverage. Although AON had, in the past, procured breach of warranty protection for three of Harbor's vessels under a former policy issued by HIH Marine, it had no involvement in obtaining the breach of warranty protection under the Debis policy.
The same holds true with Frenkel. Frenkel, which had been Harbor's former broker, devised Debis's breach of warranty insurance plan with Commercial Union years before the SES 109 transaction. Frenkel had no relationship with plaintiffs at the time of the Debis transaction that would have given rise to a duty to inform plaintiffs that breach of warranty coverage would not benefit plaintiffs. It did not *207 have any advance knowledge of Harbor's refinancing with Debis. It was not brought into the picture until after Mihm accepted Debis's offer to provide breach of warranty insurance.
McCue was plaintiffs' insurance broker. Given Mihm's instruction to Aitkens to secure coverage for the loan, we assume for purposes of discussion that McCue owed a duty to plaintiffs, and that a jury could have concluded that it breached that duty. That said, even with the benefit of that assumption, plaintiffs have failed to submit any evidence, beyond a scintilla, that a breach of duty by McCue, or by either of the other defendants, proximately caused plaintiffs' damages.
To succeed in an action against an insurance broker, the plaintiff must prove that in addition to being negligent, the broker's negligence was a proximate cause of the loss. Regino v. Aetna Cas. & Sur. Co., 200 N.J.Super. 94, 99, 490 A.2d 362 (App.Div.1985). Harbor has not established that its loss would not have occurred but for defendants' negligence, or that defendants' negligence constituted a substantial contributing factor to the loss. Perez v. Wyeth Labs., Inc., 161 N.J. 1, 27, 734 A.2d 1245 (1999).
Generally, issues of proximate cause are considered to be jury questions. Ibid. Nevertheless, the record here contains insufficient evidence to raise a genuine issue of material fact from which a jury could infer that even if defendants had breached a duty to plaintiffs, the breach was a proximate cause of plaintiffs' claimed damages. This is so primarily because breach of warranty coverage was not available to plaintiffs in any event.
The purpose of breach of warranty coverage was to protect the lender from breaches committed by the borrower with respect to the hull policy. John Hickey, the former president and CEO of the American Hull Insurance Syndicate, an expert offered by defendants, explained why a breach of warranty policy would never cover a ship owner. Hickey wrote that "[t]he coverage is not intended to protect an owner who causes the lapse of the [underlying] hull coverage leaving the lender unprotected," and that "[t]o provide a breach of warranty cover benefiting a shipowner/operator would violate the basic principles of marine insurance underwriting." He added that "[i]t would not be possible to place Breach of Warranty coverage for a shipowner/operator in any recognized Marine Market and it would not be possible to add the shipowner/operator as an assured or beneficiary under the Lender's insurance coverage." Klagholz added that the insurer could not have included Harbor's interest in the breach of warranty policy while still retaining a subrogation clause in the policy.
Those opinions were unrefuted. The evidence established that breach of warranty coverage was not available for plaintiffs as the vessel's owners. Consequently, because that coverage was unavailable, the failure of defendants to obtain that insurance for plaintiffs could not have been a cause of plaintiffs' damages.
Plaintiffs argue, however, that defendants breached their duty and proximately caused plaintiffs' damages by failing to inform them that breach of warranty coverage was unavailable to the vessel's owner. That argument is not supported by the record. Although an insurance broker's failure to warn his client that coverage is unavailable may constitute a breach of duty "to the same extent as . . . had there been a failure to issue a policy which the broker promised to procure," DiMarino v. Wishkin, 195 N.J.Super. 390, 393, 479 A.2d 444 (App.Div.1984), plaintiffs have not produced *208 evidence from which a jury could conclude that Mihm would have acted differently if he had been informed that breach of warranty insurance was unavailable for the owner of the vessel. The evidence does not show that Harbor would have, or could have, obtained similar coverage, or that Harbor would have rescinded its contract to buy the vessel had it known that no such coverage was available. Plaintiffs have simply failed to submit sufficient evidence to allow a jury to infer that Harbor realistically would have taken any action, other than to close the loan and purchase the ship, had Mihm known that plaintiffs could not obtain breach of warranty coverage.
What is more, the evidence is overwhelming that Mihm was aware that the breach of warranty insurance was only available for the lender. This provision was in the mortgage, and Ivey made it clear in her fax, stating: "This type of coverage is, simply put, lender's insurance. Should the insured do anything which violates the . . . insurance coverage and which may render the coverage invalid, Breach of Warranty insurance coverage will pay the outstanding loan balance to the lender. This coverage is a requirement for our loan." Mihm conceded that he received a copy of the fax. Aitkens discussed that fax with Mihm.
Mihm was an experienced businessman. His sole purpose in obtaining the breach of warranty coverage was to satisfy the requirements of the lender. Regardless of what any of the brokers may have said, or not said, no reasonable jury could conclude that Mihm believed that the policy would provide coverage after a loss of coverage under the hull policy occasioned by his own misrepresentations both to the lender and to the insurer.
We reverse the order denying summary judgment to defendants, vacate the final judgment, and dismiss plaintiffs' complaint.
NOTES
[1] The company's name is spelled with a lowercase "d." The parties' briefs use a capital "D." For ease of reading, we refer to it as "Debis" in this opinion.
[2] As we have indicated, the breach of warranty carrier rejected Debis's claim under that policy. Nevertheless, in its February 2000 federal lawsuit, Debis recovered $325,000 from plaintiffs for plaintiffs' default under the mortgage.