**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1662-18T1

WAKEFERN FOOD CORP.,
AJS SUPERMARKETS, LLC,
BUONDADONNA SHOPRITE,
LLC, BROWN'S BC, LLC, OF
NEW JERSEY, BROWN'S FH,
LLC, LITTLE FALLS SHOPRITE
SUPERMARKETS, INC., SHOPRITE
OF HUNTERDON COUNTY, INC.,
COWHEY FAMILY MARKETS,
BROOKDALE SHOPRITE, INC., KRE,
INC., EICKHOFF SUPERMARKETS,
INC., KGJ ASSOCIATES, LLC, HFE,
INC., FIVE STAR SUPERMARKETS
OF CLINTON, INC., FIVE STAR
SUPERMARKETS OF NEW LONDON,
INC., WEST HAVEN MARKETS, INC.,
HAMDEN MARKETS, INC., SUNRISE
SHOPRITE, INC., SUNRISE SHOPRITE OF
PARSIPPANY, LLC, SUNRISE SHOPRITE
LIQUORS, INC., GLASS GARDENS, INC.,
SHOPRITE OF ENGLEWOOD ASSOCIATES,
INC., ROCKAWAY SHOPRITE ASSOCIATES,
INC., NYC SHOPRITE ASSOCIATES, INC.,
GRADE A MARKET, CT LIMITED PARTNERSHIP,
GRADE A MARKET-DERBY-LLC, GRADE A
SHOPRITE OF FAIRFIELD LLC, INSERRA
SUPERMARKETS, INC., LML SUPERMARKETS,
INC., JANSON SUPERMARKETS, LLC, MLTK,
LLC, McMENAMIN FAMILY SHOPRITE, INC.,

KTM SUPERMARKETS, INC., KTM II
SUPERMARKETS, INC., RONETCO
SUPERMARKETS, INC., BYRAM BEVERAGE,
HACKETTSTOWN BEVERAGE, INC., SAKER
SHOPRITES, INC., VILLAGE SUPERMARKET,
INC., CHEWS LANDING SHOPRITE, INC.,
KEARNY SHOPRITE, INC., SHOPRITE OF
LINCOLN PARK, INC., SHOP-RITE
SUPERMARKETS, INC., PRRC, INC., and
WAVERLY MARKETS OF EAST HARTFORD,
LLC,

       Plaintiffs-Respondents/
       Cross-Appellants,

and

LEXINGTON INSURANCE COMPANY AND
THE ASSOCIATED AGENCIES INC.,

       Plaintiffs,

v.

BWD GROUP, LLC,

       Defendant-Appellant/
       Cross-Respondent.

_____

       Argued February 26, 2020 – Decided April 8, 2020

       Before Judges Fuentes, Mayer and Enright.

       On appeal from the Superior Court of New Jersey, Law
       Division, Middlesex County, Docket No. L-6483-13.

Bruce D. Greenberg argued the cause for appellant/ cross-respondent (Lite DePalma Greenberg, LLC, attorneys; Bruce D. Greenberg, of counsel and on the briefs).

Sherilyn Pastor argued the cause for respondents/cross-appellants (McCarter & English, LLP, attorneys; Sherilyn Pastor, of counsel and on the brief).

PER CURIAM

Defendant BWD Group, LLC (BWD) appeals from a November 9, 2018 order denying BWD's motion for judgment notwithstanding the verdict (JNOV) and its alternative motion for a new trial. Plaintiff Wakefern Food Corp. (Wakefern) cross-appeals from a separate November 9, 2018 order, which granted in part and denied in part Wakefern's request for taxed costs and fees. Wakefern also cross-appeals from a September 28, 2018 order for final judgment, which limited Wakefern's damages against BWD to $10,957,058.70 plus $1,111,466.02 in pre-judgment interest and declined to award Wakefern counsel fees. Lastly, Wakefern challenges certain evidentiary rulings made during the trial. We affirm.

I.

Wakefern, a retailer-owned cooperative group of supermarkets, consists of forty-nine members that own hundreds of stores in six states, including New

Jersey. Stores operate under various names, including Shop-Rite. Most members own one store; one-third of Wakefern's members own multiple stores.

For more than fifty years, two insurance brokerage firms, BWD and The Associated Agencies, Inc. (Associated), worked together to obtain the best insurance options for Wakefern. The brokers, operating pursuant to service contracts, were required to provide brokerage services to Wakefern. BWD's contract also required it to provide ancillary management services including coverage interpretation, and BWD's general counsel was responsible for interpreting ambiguous terms in insurance contracts. Associated received approximately $250,000 and BWD received $537,500 per year for their brokerage services.

Wakefern maintained various types of insurance policies that were renewed on a regular basis. Each month, members of a Retail Insurance Committee (RIC) met to review quotes from brokers and discuss policy options. Attendees at RIC meetings included Craig Hoffman, Wakefern's Risk Manager; Roger Blumenkranz and Stuart Wilkins with BWD; and Phillip Corso, on behalf of Associated.

Wakefern had a strong interest in keeping insurance deductibles low because many small store owners could not manage large deductibles. To that

A-1662-18T1

end, Wakefern utilized a "captive" insurer in Bermuda known as Insure-Rite, which permitted Wakefern to self-insure deductibles in order to keep them low. If Insure-Rite paid an insurance claim, it used funds derived from premiums paid by Wakefern.

As of 2011, Wakefern's property insurance policy was provided by Affiliated Factory Mutual (Affiliated) and the deductibles were $10,000 per store. At an August 2011 RIC meeting led by Craig Hoffman, Hoffman and the brokers recommended that Wakefern continue to maintain coverage with $300 million limits and a $10,000 per location deductible. In August 2011, Hurricane Irene hit New Jersey and Wakefern filed an $8 million insurance claim attributable to power losses and product spoilage. In October 2011, a snowstorm triggered more power losses and caused $5 million in damages to Wakefern. Affiliated covered those losses minus the $10,000 per store deductible.

Wakefern's policy with Affiliated was due to expire by October 1, 2012, so in spring 2012, Wakefern and its brokers discussed renewing Wakefern's property insurance coverage. Affiliated offered to renew its policy but as a result of the losses Wakefern suffered in 2011, it sought to raise Wakefern's deductible from $10,000 per location to $100,000, and substantially increase the premium. Wakefern asked its brokers to consider alternative insurers. As late

as September 2012, Wakefern's brokers continued to explore policy options. Wakefern's representatives complained to Wilkins about BWD's delay in providing policy options. Wilkins countered that the delay stemmed from Wakefern's failure to provide timely information regarding its total insurable values (TIV) for all its stores. The TIV changed yearly depending on renovations to the stores.

During the renewal process, Zurich Insurance Group Ltd. (Zurich), expressed interest in providing an insurance quote but first wanted to inspect some of Wakefern's locations. Due to the impending expiration of the Affiliated policy, Zurich ultimately gave Wakefern a quote without the requested inspections.

In September 2012, Associated's representative, Corso, reported it approached seven carriers, four of which would not write a policy for Wakefern. Associated further advised one insurer would only provide coverage of $5 million. Corso also sent Hoffman a conditional renewal letter from Affiliated. Hoffman responded that Affiliated's proposal involved a rate increase on Wakefern's insurable values that would trigger an additional $800,000 in premium costs to Wakefern, which was unacceptable.

A-1662-18T1

BWD reported that of the insurers it explored, seven declined coverage. Zurich offered a policy with a $1 million self-insured deductible that was not acceptable to Wakefern. Lexington Insurance Company (Lexington) provided a quote for $500 million in coverage with a $25,000 deductible per location and a two percent named storm deductible (NSD).

During a mid-September 2012 meeting, Wakefern's brokers offered two options: (1) renew with Affiliated at a cost of $5.8 million; or (2) purchase a policy from Lexington, at a cost of $4.6 million. Both quotes included the amount of money Wakefern's membership would pay out of pocket through its captive insurance company. The Affiliated policy had no NSD, and losses as a result of a storm would have been considered "business interruption" losses.

Kenneth Cameron, Vice President and Large Property Manager at BWD, was the primary contact for Wakefern. On September 18, 2012, Cameron emailed Hoffman and explained that the Lexington service interruption[1] deductibles would be capped at $250,000 per location and warehouse losses would also be capped at $250,000. In his response, Hoffman claimed he was confused, and advised that Cameron's email was the first time he heard of a per-

---

[1] Service interruption is when the store loses service.

A-1662-18T1

occurrence deductible of $250,000. On September 18, Corso emailed Hoffman a proposal for renewal with Affiliated that included a wind deductible of $100,000 per location, and a $5 million cap on spoilage. Corso told Hoffman the Lexington proposal was better than what Affiliated was offering, subject to BWD's analysis.

On September 21, 2012, the brokers sent a chart to Hoffman with side-by-side comparisons of the Lexington and Affiliated policies. Hoffman reviewed every line of the document with Corso and Cameron. Under wind and hail coverage, the Lexington deductible was $250,000 but for a named storm, the deductible was two percent of TIV, meaning two percent of the total amount for which the store was insured.[2] According to Hoffman, Cameron and Corso represented Lexington's NSD provision applied to property damage only, and not loss of merchandise. Wilkins later acknowledged he knew at the September 24, 2012 RIC meeting that the NSD included TIV and not just structural damage.

Although the Affiliated policy did not have an NSD, Hoffman understood coverage from Affiliated would cost approximately $1 million more per year than coverage offered by Lexington. Ultimately, the RIC voted to bind the

---

[2] The record did not disclose why the TIV that the two insurers considered differed by $50 million.

Lexington policy, but the record reflects that prior to binding the policy, BWD did not provide Wakefern with an analysis of how Lexington's NSD would impact Wakefern's stores.

By October 26, 2012, Superstorm Sandy (Sandy) was imminent. Hoffman reviewed the Lexington policy and discovered for the first time that the NSD applied to two percent of TIV, not just buildings and structural damage. Hoffman immediately contacted Corso and Cameron, as well as Natan Tabak, Vice President of Wakefern. Tabak asked the brokers why they had not previously disclosed this information. After BWD's attorney reviewed the Lexington policy, the attorney advised the NSD would apply to both property damage and service interruption. Moreover, the language of the policy clarified that if multiple deductibles were impacted, the largest deductible would apply. Therefore, if a location was listed as having a TIV of $15 million, the NSD would be $300,000 for that location.

On October 29, 2012, Sandy made landfall in New Jersey, with devastating results. Approximately 150 Wakefern stores suffered losses, but only a few suffered structural damages. Many stores lost all their merchandise. Affiliated, unlike Lexington, would have treated these losses as service

interruption losses, because Affiliated's proposal for renewal did not have an NSD provision.

After Sandy, Hoffman asked all Wakefern members for summaries of their losses. Such losses included spoiled products, expenses for generators, dry ice, clean up service, cleaning supplies, and equipment repairs. Hoffman gathered the loss information and submitted an official claim to Lexington for $55.4 million. Lexington compensated Wakefern for approximately $27 million of the claim but declined to pay roughly $24 million of the claim because of the NSD.

Wakefern sued Lexington, BWD and Associated. Wakefern settled with Lexington and Associated, but not BWD. At trial, Wakefern provided expert testimony from Stanley Lipshultz, who testified that BWD did not meet the standard of care for its industry.

On August 22, 2018, the jury returned a verdict in favor of Wakefern and found BWD liable for breach of contract, breach of fiduciary duty and professional negligence. For each claim, the jury unanimously determined BWD proximately caused Wakefern's losses. As Associated settled with Wakefern prior to the verdict, the trial judge instructed the jury to apportion responsibility for Wakefern's losses. The jury determined Associated was thirty percent and BWD was seventy percent responsible for Wakefern's damages, and

awarded Wakefern $15,652,941 in total damages. On September 28, 2018, the trial court entered final judgment against BWD in the sum of $10.957 million, plus prejudgment interest of $1.111 million.

BWD moved for a new trial or JNOV. Both motions were denied. Wakefern's attorneys moved for reimbursement of their counsel fees, as well as costs totaling $77,074 (which included costs for trial transcripts, copying, rental of multimedia equipment, and technical support). The court granted Wakefern reimbursement of taxed costs against BWD in the sum of $199.41 but denied any reimbursement for attorney's fees.

## II.

On appeal, BWD seeks reversal of the final judgment, arguing the trial court erred in denying BWD's motion for a new trial or JNOV. BWD contends the judgment must be reversed because BWD did not proximately cause Wakefern's damages and Wakefern's expert failed to demonstrate otherwise. BWD also claims it is entitled to a new trial or JNOV because Wakefern's trial counsel made improper remarks during her summation, contrary to the trial judge's instructions.

Wakefern cross appeals from the trial court's reduction of the jury award and denial of an award of counsel fees. Wakefern also challenges the judge's

denial of most of the costs sought by Wakefern.   Further, Wakefern argues the trial court abused its discretion by precluding evidence that Wakefern was able to purchase a superior policy from Zurich after Sandy, and deposition testimony from the insurance broker who placed the Zurich policy.

A.  BWD's Appeal

BWD requests reversal of the final judgment or alternatively, a new trial because Wakefern failed to prove BWD proximately caused their losses.   We disagree.

The jury returned a unanimous verdict against BWD on Wakefern's claims for breach of contract, breach of fiduciary duty and professional negligence. Additionally, the jury concluded Wakefern suffered $15,652,941 in damages. As the jury determined Associated was responsible for thirty percent of Wakefern's losses, the judge entered a final judgment against BWD for $10,957,058, exclusive of prejudgment interest.

When denying BWD's motion for JNOV or a new trial, the court found "the jury's verdict clearly represented a rejection of the notion offered by BWD that it was not the proximate cause of any loss suffered by Wakefern."  The judge determined it was reasonable for the jury to conclude BWD proximately caused Wakefern's damages, because BWD failed to give Wakefern's

representatives the information they needed to make a prudent decision about which insurance policy best met Wakefern's needs. This failure caused Wakefern's representatives to reject other policies. Further, the judge found that to show proximate cause, it was not necessary for Wakefern to prove that in 2012, a policy superior to Lexington's was available.

"[A] jury verdict shall not be reversed as against the weight of the evidence 'unless it clearly appears that there was a miscarriage of justice under the law.'" Kassick v. Milwaukee Elec. Tool Corp., 120 N.J. 130, 134-35 (1990) (quoting R. 2:10-1).

> It is the province and duty of the jurors to discuss the inferences which properly should be drawn from testimony, to resolve those inferences and, if possible, to reach a decision thereon . . . .
>
> What the trial judge must do is canvass the record, not to balance the persuasiveness of the evidence on one side as against the other, but to determine whether reasonable minds might accept the evidence as adequate to support the jury verdict . . . . If reasonable minds might accept the evidence as adequate to support the jury verdict, it cannot be disturbed by the trial court.
>
> [Kulbacki v. Sobchinsky, 38 N.J. 435, 444-45 (1962).]

A trial court's denial of a motion for a new trial shall not be reversed unless it "clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. Hence, appellate review focuses on whether the evidence submitted to

the jury, and any legitimate inferences which can be drawn from that evidence, support the jury verdict.  Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969).  A jury's factual determinations will be disturbed only if a reviewing court finds that the jury could not have reasonably used the evidence to reach its verdict.  Sons of Thunder v. Borden, Inc., 148 N.J. 396, 416 (1997).

The standard for granting JNOV under Rule 4:40-2 is that the trial court must accept as true all the evidence which supports the party defending against the motion and must give all legitimate inferences to that party.  Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 4:40-2 (2020).  If reasonable minds could differ, the motion should be denied.  Ibid.

"[A]n insurance broker who agrees to procure a specific insurance policy for another but fails to do so may be liable for damages resulting from such negligence."  Aden v. Fortsh, 169 N.J. 64, 79 (2001).  To succeed in an action against an insurance broker, the plaintiff must prove that the broker's negligence was a proximate cause of the loss.  Regino v. Aetna Cas. & Sur. Co., 200 N.J. Super. 94, 99 (App. Div. 1985) (superseded by statute on other grounds).  Proximate cause is established by showing the negligent conduct was a "substantial contributing factor" in causing damages.  Lamb v. Barbour, 188 N.J. Super. 6, 12 (App. Div. 1982).  Proximate cause is generally considered to be a

14

A-1662-18T1

question for the jury.  Harbor Commuter Serv., Inc. v. Frenkel & Co., 401 N.J. Super. 354, 368-69 (App. Div. 2008) (holding that because a particular coverage was not available to the plaintiffs, the failure of the broker to obtain it could not have proximately caused the damages).

BWD argues on appeal, as it did before the trial court, that Wakefern produced no evidence that another carrier would have paid Wakefern more than the $27 million paid by Lexington.  Further, BWD claims that even assuming it breached its fiduciary duty and service contract with Wakefern, and committed professional malpractice, it did not proximately cause Wakefern's damages because there was no better insurance policy available in 2012.

BWD's argument ignores Wakefern's main contention, i.e., that the availability of a better policy was not adequately explored by Wakefern's executives and the RIC because the information BWD supplied was incomplete. Moreover, BWD never accurately explained the ramifications of the NSD. Therefore, before they bound the Lexington policy, Wakefern's representatives did not understand the application of the NSD would result in a deductible of $24 million.

In light of the evidence presented at trial, we perceive no basis for reversing the trial judge's finding that the jury could conclude BWD proximately

caused Wakefern's damages by failing to provide accurate information about the NSD, and by recommending that Wakefern bind the Lexington policy. Accordingly, the judge properly denied BWD's JNOV motion and its alternative request for a new trial.

To the extent BWD argues for reversal by claiming Wakefern's expert (Lipschultz) failed to demonstrate BWD proximately caused Wakefern's injuries, again, we disagree. "[A]n insurance broker owes a duty to his principal to exercise diligence in obtaining coverage in the area his principal seeks to be protected." Satec, Inc. v. Hanover Ins. Grp., Inc., 450 N.J. Super. 319, 329 (App. Div. 2017) (alteration in original) (quoting Werrmann v. Aratusa Ltd., 266 N.J. Super. 471, 474 (App. Div. 1993)). Insurance intermediaries have a fiduciary duty to the client "to exercise good faith and reasonable skill in advising insureds." Weinisch v. Sawyer, 123 N.J. 333, 340 (1991) (superseded by statute on other grounds).

N.J.S.A. 2A:53A-27 compels a plaintiff claiming damages for personal or property damages resulting from an alleged act of malpractice by a licensed professional to provide a statement by an expert in the field that the licensed professional did not adhere to acceptable professional standards of care or treatment practices. But the common knowledge doctrine is available in cases

where the "jurors' common knowledge as lay persons is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts." Hubbard ex rel. Hubbard v. Reed, 168 N.J. 387, 394 (2001) (citation omitted).

BWD argues insurance brokerage operations do not fall within the ambit of jurors' common knowledge, so Wakefern needed an expert to explain how BWD proximately caused Wakefern's injuries. BWD claims Lipshultz did not provide this explanation nor did he state whether in 2012, there was a policy available that better suited Wakefern's needs. Hence, BWD contends the jury could not ascertain whether BWD proximately caused Wakefern's losses.

In fact, Lipshultz opined that: BWD's contract required it to provide professional assistance and interpretation of policy terms; BWD did not meet the standard of care; when BWD procured insurance in 2012, it focused almost entirely on price and ignored other factors; BWD should have given a full explanation of the NSD; the missing information represented a deviation from the broker's standard of care; BWD did not explain the differences between the expiring Affiliated policy and the Lexington policy; up until 2012, Wakefern did not have an insurance policy with an NSD so BWD was required to explain

17

this deductible; and BWD failed to follow up with other insurance carriers who provided an initial quote.

The jury was instructed on proximate causation. A jury is presumed to have followed the court's instructions. Bldg. Materials Corp. of Am. v. Allstate Ins. Co., 424 N.J. Super. 448, 475 (App. Div. 2012). Accordingly, we are satisfied the jury could reasonably find from Lipshultz's testimony that BWD's failure to provide critical information to Wakefern's representatives deprived them of the ability to make a prudent decision, and that BWD's failure constituted a deviation from the standard of care.

Next, BWD argues in favor of reversal based on alleged improper remarks made by Wakefern's counsel in summation. We are not persuaded.

During the trial judge's comprehensive charge conference, Wakefern previewed its intent to argue the Affiliated policy would have paid Wakefern more than the Lexington policy did on its Sandy claim. In response, the judge instructed Wakefern's counsel:

> So to the extent that the concern is that you don't give this jury a coverage analysis or a coverage interpretation, you've represented that that's not your intention. Your intentions are not to tell this jury . . . what we know [Affiliated] or Zurich or anybody else would have paid out, because you don't know that. But what you can do is certainly, based on the evidence, point out that here's what we have, and what we were

deprived of was our ability to fully and fairly understand what all of the available options were.

In summation, Wakefern's counsel stated, in part:

> You also heard evidence about what [Affiliated] would do. And you were supplied documents including quotes about what [Affiliated] would have written. You also were supplied . . . information about the fact that for a [forty-seven] percent increase, Affiliated would have written a revised program. You heard testimony that what that translated to is about a million, $1.8 to $2 million in terms of premium, and it would have written different limits. It would have had extra expense for $10 million, spoilage for $10 million. It would have had $10 million of off-premises service interruption for property damage. It would have had sublimits for business interruption.

An attorney is afforded broad latitude in closing statements but may not misstate the evidence or distort the facts. Tartaglia v. UBS Paine Webber, Inc., 197 N.J. 81, 128 (2008). Counsel's summations are expected to be passionate, "for indeed it is the duty of a trial attorney to advocate." Geler v. Akawie, 358 N.J. Super. 437, 463 (App. Div. 2003). At the same time, summations should be fair and courteous, grounded in the evidence, and free from "[u]nfair and prejudicial appeals to emotion." Id. at 468.

BWD contends counsel for Wakefern did exactly what the judge told her she could not do inasmuch as she essentially said that Affiliated would have paid on the Sandy-related claim differently than Lexington. However, the record

19

demonstrates comments made by Wakefern's counsel were neither highly prejudicial nor harmful. Further, Wakefern's counsel essentially summarized a document that was in evidence when she described the terms of Affiliated's renewal offer in September 2012. Because the information Wakefern's counsel conveyed during summation was presented to jurors during the trial, they were permitted to consider that other insurance coverage could have produced a different result. Accordingly, closing arguments by Wakefern's counsel did not contravene the judge's instruction and were not improper.

B. Wakefern's Cross-Appeal

On its cross-appeal, Wakefern argues the trial judge erred by excluding evidence regarding the 2013 Zurich policy and the "read-in" deposition testimony of an insurance professional, Joanne Quintal. Quintal was an out-of-state-witness who placed the Zurich policy for Wakefern but refused to appear for trial. Wakefern's arguments are unavailing.

A trial court's decision to admit or exclude evidence is entitled to deference absent a showing of an abuse of discretion. Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016). A reviewing court will only reverse an evidentiary ruling if it "was so wide off the mark that a manifest denial of justice resulted." Ibid. (citation omitted). A court may only admit evidence that is

relevant, i.e., proves or disproves a fact of consequence to the determination of the action. N.J.R.E. 401.

Here, prior to trial and in response to a motion in limine, the judge concluded the Zurich policy was relevant and probative. As the trial progressed, however, the judge sua sponte reconsidered her earlier ruling and determined evidence pertaining to the 2013 Zurich policy was irrelevant because it was purchased after Sandy and was not probative of what insurance policies were available to Wakefern prior to Sandy. The judge also prohibited Wakefern's counsel from reading into the record the lengthy deposition transcript of Joanne Quintal.

Wakefern's counsel wanted jurors to know that even after suffering over $50 million in losses in 2012, Wakefern obtained a better policy with Zurich than the policy BWD recommended prior to Sandy. Wakefern's counsel claims this information should have been presented to the jury to support Wakefern's claim that BWD failed to meet its professional standard of care. But given that the jury unanimously found in favor of Wakefern on all counts, Wakefern fails to demonstrate this evidentiary ruling constituted a manifest denial of justice. Likewise, we cannot agree the trial judge improperly barred counsel from reading Quintal's deposition testimony into the record.

Initially, we acknowledge that under certain circumstances, Rule 4:16-1 allows a party to read the deposition testimony of an out-of-state witness who is not available. But this rule conditions the use of such deposition testimony on its admissibility. Ibid. Here, the judge found Wakefern's counsel sought to use "not just . . . a few snippets here or there, [but] . . . essentially the entirety, practically, of this woman's testimony . . . on a pretty crucial issue," adding:

> I am not persuaded that this testimony being offered by this witness is relevant for this jury's consideration, because we are talking about a policy that was secured after . . . Sandy, . . . and now the process by which this new broker is now going to attempt to secure coverage for Wakefern is informed by what they had just experienced through . . . Sandy and the deficiencies contained in [the Lexington] policy and what the brokers did or did not do in relation to having secured the previous policy.
>
> . . . .
>
> And beyond that, at the end of the day, I really don't find it to be relevant to the jury's determination in this case.

Based on our careful review of the record and our deferential standard of review, we are satisfied the judge did not abuse her discretion when she found Quintal's deposition testimony was not relevant to the issues the jury needed to decide and that any read-in would be time-consuming. See N.J.R.E. 403(b) (a

judge has the authority to exclude even relevant testimony if its probative value is substantially outweighed by the risk of "undue delay" or a "waste of time").

Wakefern next argues the court erred in reducing the jury's award. We disagree. At the jury charge conference, the court discussed at length how the verdict sheet should be worded so as not to "duplicate" damages and create confusion. Counsel for Wakefern appeared to argue in favor of the jury arriving at an amount for total damages when she stated, "I wouldn't want there to be a number that isn't the total damages." She also argued there should be no allocation for Associated's negligence given Associated settled with Wakefern and Wakefern's expert concluded Associated was not negligent.

The judge acknowledged the distinction between damages under a contract theory and damages under negligence. Further, the judge preliminarily stated she would mold the verdict after the jury's determination. Subsequently, before she charged the jury, the judge noted Wakefern's claims for breach of contract and fiduciary duty as well as professional malpractice were intermingled and could not be separated out for purposes of damages. Accordingly, the judge concluded apportionment would be necessary regardless of the theory of liability. Thereafter, the judge instructed the jury to determine whether Associated was negligent and whether that negligence contributed to

23

Wakefern's loss.  If the jury found Associated was negligent, it was told to apportion the fault attributable to BWD and Associated.  In fact, a verdict sheet question specifically asked the jury what amount of money would "fully, fairly and reasonably compensate Wakefern for any damages caused by [defendant's] breach of contract and/or breach of fiduciary duty and/or professional negligence."  The court stated:

> [A]nd you're going to record an amount that fully and fairly compensates the [p]laintiff for damages caused by [defendant's] breach of contract, breach of fiduciary duty and/or breach of professional negligence, and <u>whatever figure you come up with has to be done without regard to any apportioning that you did in the previous question.  All right?  In terms of percentages for fault.</u>

(Emphasis added).

Notwithstanding these instructions, Wakefern argues the judge erred in reducing the jury's award because the jury's award of damages was without regard to any fault on the part of Associated.   We are satisfied a plain reading of the judge's instructions confirms the jury was directed to arrive at a total amount of damages without regard to apportionment.  The fact that the judge stated the jury should assess damages caused by "defendant" is of no moment because BWD was the only party left in the case after Associated and Lexington settled.  Accordingly, the judge correctly molded the verdict to coincide with

24

the jury's decision to find Associated thirty-percent and BWD seventy-percent liable for Wakefern's losses.

Lastly, Wakefern argues the trial judge committed error by denying it reimbursement for counsel fees and awarding Wakefern only limited costs. Wakefern claims the case was "paper intense" and required counsel to introduce thousands of pages into evidence over several days of trial. Accordingly, Wakefern requested $77,074 in taxed costs, including costs for trial transcripts, technical support, rental of multimedia equipment, copying costs and witness appearance fees. The judge found many of Wakefern's expenses were not necessary but incurred for the convenience of counsel to present their case. Additionally, the judge determined Wakefern's copying costs, totaling close to $10,000 were not reasonable, as many documents appeared in duplicate. However, the judge found BWD should reimburse Wakefern $199.41 for filing and witness appearance expenses.

A prevailing party is entitled to costs so long as the costs were "necessarily incurred" and "are reasonable." R. 4:42-8. An award of costs is discretionary. Huber v. Zoning Bd. of Adjustment of Howell Twp., Monmouth Cty., 124 N.J. Super. 26, 28 (Law Div. 1973). Here, we perceive no abuse of discretion regarding the trial judge's partial award of costs to Wakefern.

Similarly, we decline to reverse the trial court's denial of counsel fees to Wakefern. An award of counsel fees is discretionary with the court and will not be reversed absent a demonstration of manifest abuse of discretion. In re Probate of Alleged Will of Landsman, 319 N.J. Super. 252, 271 (App. Div. 1999). New Jersey abides by the American Rule, so that parties are responsible for their own attorney fees, unless their case falls under an exception enumerated in Rule 4:42-9. In In re Estate of Vayda, 184 N.J. 115, 121 (2005), the Court discussed New Jersey's limited exceptions to the American Rule and reiterated that fees are only permitted in malpractice and breach of fiduciary duty actions when the lawsuit is brought against a negligent attorney, and not for other professionals. The Court stated, "the fact that a person owes another a fiduciary duty, in and of itself, does not justify an award of fees unless the wrongful conduct arose out of an attorney-client relationship." Innes v. Marzano-Lesnevich, 224 N.J. 584, 596 (2016) (quoting In re Estate of Lash, 169 N.J. 20, 34 (2000)). Guided by these principles, we are satisfied the trial judge properly denied Wakefern's request for counsel fees.

To the extent we have not discussed the remaining arguments of the parties, we find they are lacking in merit. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1662-18T1